STATE OF CONNECTICUT *v.* ROBERT K. JEFFREY
(13904)

SHEA, CALLAHAN, COVELLO, BORDEN and BERDON, Js.

Argued October 3—decision released December 31, 1991

*Richard Emanuel,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *David Gold,* assistant state's attorney, for the appellee (state).

SHEA, J. After a jury trial the defendant, Robert K. Jeffrey, was convicted of the crimes of sexual assault in the first degree in violation of General Statutes § 53a-70 (a)[1] and kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A).[2] He was subsequently sentenced to an effective term of twelve years imprisonment, suspended after eight years followed by four years probation. He appeals from that judgment, claiming that the trial court improperly: (1) admitted into evidence a urine stained shirt worn by the complainant on the night of the incident; (2) admitted into evidence a "sex crimes report" prepared by the police; (3) admitted into evidence a certain prior consistent statement made by a witness for the state; (4) failed to instruct the jury on the defendant's reasonable belief that the complainant had consented; (5) defined a reasonable doubt as a doubt that a juror could explain to the other jurors; and (6) admitted evidence of the defendant's postarrest silence. We affirm the judgment.

The jury reasonably could have found the following facts. On October 12, 1988, the defendant and the complainant, previously strangers to each other, met at a bar in Wallingford where the complainant was a regular patron. The defendant introduced himself as "Bob" and mentioned that he owned a nightclub in Old Saybrook. They spent several hours eating, drinking, playing pool and otherwise socializing with each other

---

[1] General Statutes § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with a person under thirteen years of age."

[2] General Statutes § 53a-92 (a) (2) (A) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and when . . . he restrains the person abducted with intent to . . . inflict physical injury upon him or violate or abuse him sexually."

and others in the bar until approximately midnight, when a group of people, including the complainant and the defendant, decided to go to a nearby nightclub for "last call." The defendant offered the complainant a ride and she accepted. After they had entered the car, the defendant started toward the nightclub, but, when the car reached a certain intersection, he drove straight ahead into a local park instead of turning down the street that would have brought them to the nightclub. He drove to the end of a parking lot in the park and proceeded onto a grassy area where he parked the car. When the complainant asked why they had come to the park, the defendant replied that it was better there and attempted to kiss her. When the complainant refused and tried to push him away, the defendant lifted her shirt and bit her breasts. Next, the defendant exposed his penis, asked the complainant to perform oral sex and, when she refused, forced her to do so. He then pulled the complainant's pants down and inserted his finger into her vagina. Shortly thereafter, they got out of the defendant's car, and the complainant attempted to run away. Once the defendant had caught up with her, he grabbed her breasts from behind, swore at her, forced her pants down again and slapped her on the buttocks, repeating his curse.[3] He proceeded to remove the complainant's pants and sneakers and then penetrated her anus with his finger. He then attempted anal intercourse with the complainant. Next, the defendant urinated on the complainant's stomach and lower abdomen, rubbing the urine around her vaginal area and then inserting his fingers into her mouth. He then forced her to have vaginal intercourse with him until he withdrew and ejaculated into her mouth. After another act of forced vaginal intercourse, during which the defendant repeatedly bit the complainant's breasts, he urinated on her once again and then got off of her

[3] In both instances the defendant said, "You like this, Bitch."

and smoked a cigarette. After these events, the defendant drove the complainant back to the bar where they had met. He dropped her off, and the two returned to their respective homes.

Several days later, at the behest of a friend to whom she had confided the story, the complainant reported the incident to the police. The next day the police arrested the defendant after the complainant had positively identified him by choosing his picture from a photo array.

The jury heard contrary testimony from the defendant, who admitted having engaged in various sexual acts with the complainant, but claimed that he had done so with the complainant's consent. According to the defendant, sometime between 11 p.m. and midnight, after socializing with the complainant and others for most of the evening, he left the bar alone, but the complainant followed him outside. They kissed for a short while, and then he asked the complainant if she wanted to get into his car. She agreed, and they entered the car and began to kiss more passionately. The complainant stated that they should not persist right in front of the bar, prompting the defendant's suggestion that they go elsewhere. He then drove to the park and stopped the car in a certain secluded area, which the complainant said was all right. They left the car and engaged in consensual sexual intercourse. Afterwards, they drove back to the bar but, once there, decided to return to the park to resume their sexual activity. They again had intercourse and also engaged in oral sex. The defendant stated that, at a certain point, he did interrupt the sexual activity in order to urinate, but that, when he did so, he purposely turned away from the complainant, so as not to urinate on her or toward her. Presumably, the jury disbelieved the defendant's version of the facts because it convicted him of both sexual assault and kidnapping.

I

The defendant's first claim on appeal is that the trial court abused its discretion when it admitted into evidence the urine stained shirt worn by the complainant on the night the alleged sexual assault was committed. Our review of the record satisfies us that the admission of the urine stained shirt was a proper exercise of the trial court's discretion.

Some background information is necessary. The shirt was initially marked for identification during the direct testimony of the complainant, who testified that it was the shirt she was wearing on the night of the incident and, that it had been clean before she put it on that night. The shirt had remained on her throughout the sexual assault, although it had been pushed up at times. According to the complainant, she arrived home after the sexual assault, took off her clothes, including the shirt, and put them on her bedroom floor. The next day she washed other clothing she had been wearing that night, but did not wash the shirt at any time before she handed it over to the police on October 17, 1988. On cross-examination, she stated that, during the time period involved, she owned three pets, one dog and two cats.

A hearing was then held, outside the presence of the jury, in which the court heard the testimony of Debra Messina, a criminologist at the state police forensic laboratory, who stated that she had tested a stain on the shirt and found only one substance, creatinine, a chemical found in human and animal urine. The defendant advanced several objections to the admission of the shirt into evidence, but the court overruled them, stating that any weaknesses in the evidence went to its weight and not to its admissibility. Thereafter, Messina repeated her testimony before the jury, adding that

creatinine is contained in no other substance but urine. The shirt was admitted into evidence as a full exhibit over the defendant's objection.

The defendant contends that the shirt should have been excluded as irrelevant because the state had failed to establish an adequate link between the urine stain and the defendant. He also argues that the shirt should have been excluded because the state had failed to establish that the shirt had not been materially altered or tampered with in any way during the time it lay on the complainant's bedroom floor until the police seized it several days later. Finally, the defendant maintains that even if the shirt was relevant evidence, the trial court abused its discretion when it admitted it into evidence because its prejudicial effect outweighed any probative value it might have had. We address these claims seriatim.

### A

In considering the defendant's first argument, we begin by noting that relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *State* v. *McClendon,* 199 Conn. 5, 8–9, 505 A.2d 685 (1986). Evidence is irrelevant if there is "such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in proof of the latter." *State* v. *Kelly,* 77 Conn. 266, 269, 58 A. 705 (1904). In this case, the complainant testified that the defendant had urinated on her during the alleged sexual assault. Evidence of a urine stain on the shirt she was wearing would tend to support the conclusion that the defendant had done so. Messina testified that creatinine, a substance found only in the urine of human beings and animals, was detected on the complainant's shirt. Even though the defendant concedes that the stain contained urine, he argues that

the shirt should have been excluded as irrelevant because Messina's testimony did not exclude the possibility that the source of the urine was one of the complainant's pets while the shirt lay on her bedroom floor rather than the defendant in the course of a sexual assault. He cites our decision in *State* v. *Moody,* 214 Conn. 616, 573 A.2d 716 (1990), in support of his argument.

In *Moody,* we reversed the defendant's murder conviction because we concluded that the trial court had abused its discretion when it admitted into evidence the result of a "presumptive test for blood" performed on a stain located on the defendant's shoe. Although an expert had testified that the stain had produced a positive test result, and he had explained that this meant only that "the stain could be human blood, animal blood *or something other than blood,*"[4] we held that "[t]he test result did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe." (Emphasis added.) Id., 628. We contrast the circumstances in *Moody,* where it could not be determined whether the stain on the defendant's shoe contained blood, with those in this case, where the stain on the complainant's shirt tested positive for creatinine, a substance that conclusively established the presence of urine. The uncontroverted evidence of urine, not just something that might or might not have been urine, distinguishes this case from *Moody* and leads us to conclude that the shirt and test results were properly admitted into evidence.

It is true that evidence of urine on the complainant's shirt does not, in and of itself, amount to proof that the defendant caused the stain, nor does it rule out other plausible explanations for its presence. These

[4] The stain on the shoe was too small for administration of a definitive blood test. *State* v. *Moody,* 214 Conn. 616, 628, 573 A.2d 716 (1990).

challenges to the evidence do not require its exclusion, however, because "evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion, even to a slight degree." *State* v. *Rinaldi,* 220 Conn. 345, 353, 599 A.2d 1 (1991). It was not necessary that the urine stained shirt prove conclusively the truth of the complainant's testimony in order to be admissible; that it tended to support her testimony to some degree made it relevant and properly admissible.

### B

With respect to the defendant's claim of material alteration of the shirt, "[t]here is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article . . . has been tampered with . . . ." *State* v. *Johnson,* 162 Conn. 215, 232, 292 A.2d 903 (1972). In each case the trial court must satisfy itself that the evidence offered probably has not been changed in important respects. *State* v. *Conroy,* 194 Conn. 623, 625–26, 484 A.2d 448 (1984); *State* v. *Asherman,* 193 Conn. 695, 722, 478 A.2d 227 (1984). The complainant's unrebutted testimony that the shirt was clean before the alleged crimes and that, afterwards, it lay on her bedroom floor undisturbed for several days until the police seized it, provided sufficient proof for the trial court to satisfy itself that the condition of the shirt probably had not been changed in any important respect since the events in question. In light of the complainant's testimony, arguments about the possibility of tampering, unsubstantiated by any affirmative proof, were properly advanced to undermine the weight attributable to the evidence, but not to preclude its admissibility.

### C

We reject the defendant's final challenge to the admission of the urine stained shirt because we con-

clude that the trial court properly determined that its probative value outweighed its prejudicial effect. While it is true that this tangible evidence, introduced shortly after the complainant's direct testimony, had the capacity to strengthen the state's case by bolstering the credibility of the complainant, it is also significant that the defendant admitted having urinated at the scene of the alleged sexual assault. He also acknowledged during closing argument that the stain on the complainant's shirt might have contained his urine, not because he had urinated on her, but because, during the course of their consensual sexual activity, she might have inadvertently rolled onto the place where he had urinated. Given the defendant's testimony and argument in this regard, we fail to perceive how he could have been unfairly prejudiced by the admission of the evidence in question. Even if the jury had concluded that the stain on the complainant's shirt contained the defendant's urine, it was free to believe the defendant's explanation that it was the result of an accident and not the result of an indignity inflicted upon the complainant during a sexual assault. The urine stained shirt could have corroborated the testimony of either the complainant or the defendant; it was the jury's credibility determination that cast the evidence in a particular light, not the mere presence of urine on the shirt. Accordingly, we conclude that the shirt had probative value and that its admission into evidence was not unduly prejudicial to the defendant and was, consequently, a proper exercise of the trial court's discretion.

## II

The defendant's next claim is that the trial court improperly admitted into evidence a "sex crimes report" prepared by Detective Patricia Miranda, the lead investigating officer in the case, after she had interviewed the complainant about the alleged crimes. A sex crimes report is a four page form used by the

police to compile data concerning sex crimes as required by General Statutes § 29-7a.[5] It contains spaces for the officer to fill in general information about the victim and the offender, such as their names, addresses and ages. It also contains a checklist of 573 standardized phrases referring to different aspects of sex crimes[6] from which the officer selects those applicable to a particular case. The sex crimes report in this case was admitted into evidence during the direct testimony of Miranda after her statement that, following her interview of the complainant, she had prepared the report in the regular course of business in accordance with her statutory duty to do so. The trial court overruled the defendant's objection that the report was irrelevant and noted the defendant's exception to the ruling.

On appeal the defendant maintains that the sex crimes report should have been excluded "primarily on

---

[5] General Statutes § 29-7a provides: "The community relations unit of the division of state police within the department of public safety shall study and plan for the establishment and funding of a sex crimes analysis unit which shall be operative on or before October 1, 1976. Said unit shall be responsible for (1) the coordination and analysis of all data regarding complaints and arrests for sex crimes; (2) the development of recommendations from such data concerning the nature, extent and pattern of sex crimes in the state; (3) recommendations with regard to new approaches in law enforcement to improve enforcement in the area of sex crimes to the division of state police, local departments and the public; (4) working with local police departments and rape crisis centers to improve law enforcement of sex crimes and methods of data gathering and (5) the development of education courses for law enforcement officials, judicial personnel and the public concerning preventive measures against sexual assaults, procedures for reporting sex crimes and community resources which are available to combat sex crimes. Each local police department, rape crisis center and any member of the public who deals with data concerning sex crimes shall submit such data to the sex crimes analysis unit in accordance with procedures established by said unit."

[6] Some of the categories included are: physical descriptions of the offender; the offender's method of approaching the victim; the nature of the assault; the victim's method of resistance; the relationship of the offender to the victim; the place where the assault was committed; and the nature of the victim's injuries.

hearsay but also on relevancy grounds." Although the relevancy claim was distinctly raised in the trial court, the defendant acknowledges that no hearsay objection was ever made. He therefore seeks "plain error" review of the hearsay claim pursuant to Practice Book § 4185.[7] We find the relevancy claim unavailing and decline to consider the hearsay claim because we conclude that the trial court's admission of the report was not plain error.

## A

In arguing that the sex crimes report should have been excluded by the trial court as irrelevant, the defendant properly notes that there are two components to relevant evidence: materiality and probative value. C. McCormick, Evidence (3d Ed. 1984) § 185, p. 541. He contends that, although the sex crimes report was material to the issues presented in the prosecution, it lacked probative value and was thus irrelevant. We do not agree that the report lacked probative value.

The probative value of evidence is its tendency to establish the proposition that it is offered to prove. *State* v. *McClendon,* supra; C. McCormick, supra. Miranda's notations on the sex crimes report clearly tended to establish the proposition that the defendant had kidnapped and sexually assaulted the complainant. Because the sex crimes report essentially catalogued the complainant's account to Miranda of what had transpired, it was probative of the defendant's guilt. That this information was admitted into evidence in the form of standardized phrases may have raised ques-

---

[7] Practice Book § 4185 provides in pertinent part: "The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The supreme court may in the interests of justice notice plain error not brought to the attention of the trial court."

tions about whether it was inadmissible hearsay or cumulative of the complainant's direct testimony, but it could not have stripped the document of its relevancy.

We also reject the argument that the report lacked probative value because it was primarily a mechanism for the compilation of statistical data about sex crimes rather than a document prepared specifically for substantive use in the criminal prosecution. Bills, receipts, records and many other forms of documentary evidence have been routinely admitted into evidence despite the fact that they were not created with courtroom use in mind. See, e.g., *Borucki* v. *MacKenzie Bros. Co.,* 125 Conn. 92, 3 A.2d 224 (1938) (hospital records); *Carangelo* v. *Nutmeg Farm, Inc.,* 115 Conn. 457, 162 A. 4 (1932) (medical bills); *Garland* v. *Gaines,* 73 Conn. 662, 49 A. 19 (1901) (letters). In fact, reports prepared specifically for litigation have at times come under attack because such documents present an opportunity for an interested party to falsify or embellish facts to serve his or her own interests. See C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 11.14.7, p. 392. We have stated that the "trustworthiness of such documents [business records] comes from their being used for business and *not* for litigation." (Emphasis added.) *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 388–89, 461 A.2d 422 (1983). Consequently, we see no merit to the contrary claim that the sex crimes report in this case should have been excluded as irrelevant because it had *not* been prepared for litigation.

## B

The defendant's claim, raised for the first time on appeal, that the sex crimes report should have been excluded as inadmissible hearsay does not warrant review under the plain error doctrine. "Such review is reserved for truly extraordinary situations where the

existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985). We need not consider whether the evidence would have been admissible under the constancy of accusation or the business records exceptions to the hearsay rule. To a great extent the sex crimes report was cumulative of the testimony of Miranda concerning her interview with the complainant. It is unlikely, therefore, that its impact was critical to the outcome of the trial. Accordingly, we decline to find that the trial court's ruling was plain error.

## III

The defendant's next claim involves the trial court's admission of certain statements made by D, a rebuttal witness for the state, to the defendant's parents and to his attorney. D, a friend of the defendant, was a bookkeeper at the nightclub in Old Saybrook that the defendant managed. Her testimony contradicted the defendant's testimony in several key respects.

According to the defendant, D slept at his apartment occasionally, but never lived there. D testified that she slept in his apartment once a week until his roommate moved out in October, 1988. At that time she moved into the apartment and remained there until June, 1989.

With respect to the incidents surrounding the alleged commission of the crimes, both D and the defendant testified that, on the night in question, the defendant was driving D's car, which he had borrowed earlier that day. Both stated that the defendant had arrived home early the next morning and returned the car to her. D further testified that, when he had brought her car back, he appeared frightened and nervous and that she had never seen him look like that before.

The defendant testified that he went to work at the nightclub as usual on the three days following his encounter with the complainant. He stated that, on the third day, when police arrived at his home to place him under arrest, he had come home from work briefly to take a nap and had asked D to come to his apartment to awaken him so that he could return to work to close the nightclub for the evening. D testified, however, that the defendant did not work on any of those days, that he looked pale and ill, and that he stayed home, complaining of chest pains. She further stated that she had gone to the apartment the night the defendant was arrested not because she had agreed to awaken him, but because she was concerned about his health.

The defendant cross-examined D by trying to establish that she was a jilted lover whom he had left in April, 1989.[8] On redirect examination, the state sought to elicit the fact that, before April, 1989, when the jilting supposedly occurred, D had made similar statements to the defendant's parents and to his trial attorney about the defendant's strange behavior during the

---

[8] The following are relevant portions of the defendant's cross-examination of D:

"[Defense Counsel]: And you were in love with Mr. Jeffrey, weren't you?
"[D]: No, I was not.
"[Defense Counsel]: Didn't you call Mr. Jeffrey's father and mother down in Florida and tell them you were in love with Robert Jeffrey and that you would always be in love with him?
"[D]: I care about him as a friend. I love him as a friend.
"[Defense Counsel]: But you didn't say that to Mr. and Mrs. Jeffrey. You said you loved him, didn't you?
"[D]: It could be taken that way, I suppose, but that's—I loved him as a friend. ·
"[Defense Counsel]: And he didn't love you back, did he?
"[D]: I don't know.
"[Defense Counsel]: And he moved out of the apartment on you, didn't he?
"[D]: He moved out—
"[Defense Counsel]: In June?
"[D]: No. He moved out, I believe it was April. He was there off and on.
"[Defense Counsel]: I have no further questions, your Honor."

period following the alleged crimes. Defense counsel objected on the ground that the state was impermissibly offering extrinsic evidence to rehabilitate the witness. He expressed concern about how he, as the defendant's lawyer, could effectively and ethically rebut D's testimony about what she had said to him. The trial court overruled the objections because it concluded that the defendant had opened the door to such questioning by attempting to impeach D in the manner that he did. Thereafter, D testified before the jury that in February or March, 1989, she had voiced her concerns to the defendant's parents and to his trial attorney about the defendant's peculiar conduct during the days following the commission of the alleged crimes. The defendant again objected and took exception to the court's ruling.

On appeal the defendant makes three challenges to the admission into evidence of D's statements to defense counsel and to the defendant's parents. First, he maintains that the trial court's admission of the statements was improper because the court failed to make a specific finding that the statements were made before D's alleged bias, interest or motive arose. Second, the defendant claims error in the trial court's failure to instruct the jury to limit its use of the statements to rehabilitating D's credibility. Third, the defendant contends that the court's admission of D's prior statement to defense counsel unfairly prejudiced him in that it presented inordinate tactical and ethical difficulties for defense counsel to surmount in order to rebut D's testimony. We find none of these arguments persuasive.

### A

With respect to the first argument, we begin by noting that if a witness has been impeached on the basis of bias, motive or interest, prior consistent statements

may be admitted to rehabilitate his damaged credibility, if the proponent of the prior consistent statement establishes that it was made before the alleged bias, motive or interest arose. *State* v. *Dolphin,* 178 Conn. 564, 570–71, 424 A.2d 266 (1979). This means that it was incumbent upon the state in this case, as the proponent of the evidence of D's prior consistent statements, to demonstrate to the court's satisfaction that these statements were made before her motive to falsify would have arisen; that is, before the defendant was said to have jilted her. We conclude that the state met this burden.

On cross-examination, the defendant elicited from D that the defendant had "moved out . . . on [her]" in April, 1989. Although never explicitly stated, the clear implication of this line of questioning was that the defendant had spurned D when he left the apartment they shared in April, 1989, and that her bias against him had arisen at that time. See footnote 8, supra. D testified that her statements to the defendant's parents and to defense counsel about the defendant's odd behavior were made in February or March, 1989. The appropriate sequence was thus established, justifying the admission of the prior consistent statements for the limited purpose of rehabilitating D, whose credibility had been attacked on the basis of bias or motive.

It is of no moment that the trial court failed to make a specific finding that the statements in dispute were made before the alleged bias or motive arose because the record positively establishes this sequence. No such finding is required so long as the record establishes the necessary sequence of events. See *State* v. *Parris,* 219 Conn. 283, 287–92, 592 A.2d 943 (1991). In this case the record establishes the necessary sequence of events.

### B

The defendant next contends that it was improper for the trial court to fail to instruct the jury that it could

consider D's prior consistent statements solely for the purpose of assessing her credibility and not for the purpose of determining the substantive truth of the statements. The defendant's failure to request such a limiting instruction or to take exception to the charge, on this basis, makes this claim unreviewable. Practice Book § 852.[9] We also decline to afford plain error review to this claim, as sought by the defendant, because the trial court's failure to give a limiting instruction did not constitute "error . . . so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." *State* v. *Hinckley,* supra; Practice Book § 4185.

## C

The defendant further argues that, even if the court properly admitted D's prior consistent statement to his parents, it abused its discretion when it allowed her to testify about her prior consistent statement to defense counsel. He claims that the court's admission of the statement "put counsel in an untenable and unfair position, one fraught with ethical and tactical difficulties." We conclude that the trial court acted properly in admitting the statement.

As discussed earlier, D's statement to defense counsel was relevant evidence that came within the prior consistent statement exception to the hearsay rule. As such, it was properly admitted regardless of whether it posed strategic or ethical dilemmas for defense counsel. Defense counsel knew what D had said to him and knew that the state had listed her as a possible witness.

---

[9] Practice Book § 852 provides: "The supreme court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of objection. Upon request, opportunity shall be given to present the exception out of the hearing of the jury."

If he was concerned that his client would be prejudiced if D's statement to him were admitted into evidence, he could have either avoided altogether the line of cross-examination that he pursued, to ensure that the hearsay statement would not be admitted into evidence, or, if he was determined to attack D's credibility in the manner that he did, he could have made a motion in limine to ascertain whether the court would allow D's statement to him into evidence. We note that defense counsel's failure to take either of these measures contributed to placing him in what he now deems an impossible situation. We decline to find error in a proper evidentiary ruling merely because defense counsel's strategy might have been upset by it.

We hasten to add that we are not convinced that defense counsel's ethical quandary was as desperate as he now portrays it to have been. The only reason he might have appeared as a witness in the case was for the purpose of rebutting D's testimony that she had spoken to him of the defendant's peculiar behavior around the time the alleged crimes were committed. Defense counsel represented to the court that his response to D's testimony would have been, not that she had not made such a statement to him months earlier, but that he had not believed her when she made the statement.[10] Testimony about whether defense counsel believed D's statement to be true would have been properly excluded as immaterial since her prior consistent statement was offered for the limited purpose of rehabilitating her credibility and not to prove its substantive truth. Consequently, such testimony by defense counsel would have *confirmed,* not rebutted, D's testimony that she had made the statement to him.

---

[10] Defense counsel asked the court, "Can I get up in—I mean, in final examination do I get to say, 'I didn't believe her?'"

Under these circumstances, an ethical question about defense counsel's appearance as a witness in the case was not likely to have arisen.[11]

## IV

Next the defendant claims that his state and federal constitutional rights to present a defense and to due process of law were violated when the trial court failed to instruct the jury that it could not convict the defendant of sexual assault if the conduct of the complainant under all the circumstances would have justified a reasonable belief that she had consented. Because the defendant failed to request such an instruction or to take exception to the court's failure to include it in the charge given, he can prevail on his unpreserved claims of constitutional error only if the following four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Although the first two conditions are met, the third condition is not because the trial court's failure to give the "reasonable belief" instruction did not deprive the defendant of any constitutional right.

---

[11] Even if defense counsel could have provided relevant testimony as a witness in the case, disqualification of him might not have been required under the third exception listed in Rule 3.7 of the Rules of Professional Conduct. Rule 3.7 provides in pertinent part: "(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) The testimony relates to an uncontested issue; (2) The testimony relates to the nature and value of legal services rendered in the case; or (3) *Disqualification of the lawyer would work substantial hardship on the client.*" (Emphasis added.)

Our conclusion that no constitutional violation occurred in this case is founded upon our decision in *State* v. *Smith,* 210 Conn. 132, 554 A.2d 713 (1989). In *Smith,* we rejected the defendant's claim that a specific intent to have intercourse without the consent of the victim is an essential element of first degree sexual assault. We adhered to our long held view, shared by a majority of courts in this country, that first degree sexual assault, as defined in our state penal code, requires proof of only a general intent to perform the physical acts that constitute the crime. We noted, however, in language relied upon by the defendant in this case, that whether the defendant had forced or compelled the complainant within the meaning of the first degree sexual assault statute depended not upon the complainant's subjective state of mind about whether she had consented, but upon "her manifestations of such consent as reasonably construed." Id., 140. We further stated that, although we doubted that "jurors would ever convict a defendant who had in their view acted in reasonable reliance upon words or conduct of the complainant indicating consent . . . a defendant . . . concerned about such a possibility . . . would be entitled, once the issue is raised, to request a jury instruction that the state must prove beyond a reasonable doubt that the conduct of the complainant would not have justified a reasonable belief that she had consented." Id., 141.

The defendant urges us to convert that language in *Smith* into a constitutional requirement that a court give such an instruction, even in the absence of a proper request to charge, whenever any sort of consent defense is interposed in a sexual assault case. We need not decide that question, however, because the defendant in this case never advanced a theory of defense that put into issue the reasonableness of his belief that the complainant had consented. Nowhere in the record of

this case, either in evidence or argument, was any suggestion made to the jury that it should acquit the defendant because he reasonably interpreted ambiguous conduct by the complainant to indicate her consent.[12] The theory of defense actually argued to the jury was that it should acquit the defendant because the complainant had fabricated all her testimony about being forced against her will to engage in sexual acts. Because the issue of the reasonableness of the defendant's belief regarding the complainant's consent was never made a theory of defense in this case, we conclude that it would have been inappropriate for the trial court to instruct the jury on that theory, at least in the absence of a proper request on such an alternate ground of defense.

## V

The defendant also contends that he was deprived of his state and federal constitutional right to due process of law when the trial court instructed the jury that a reasonable doubt is "a doubt for which if necessary you can give an explanation of to your fellow jurors in the jury deliberation room . . . ." He took no exception to the charge given. We recently rejected an identical claim in *State* v. *Ireland,* 218 Conn. 447, 457, 590 A.2d 106 (1991), because we concluded that such an articulation requirement, although improper, did not render an otherwise adequate instruction on reasonable doubt constitutionally defective. Upon review of the entire charge in this case, we arrive at the same conclusion, that the instruction given did not violate the defendant's constitutional right to due process, and, therefore, reject this claim. See *State* v. *Golding,* supra.

---

[12] That was precisely the theory of defense in *Smith,* wherein the defendant based this defense on the complainant's testimony that, after a certain point, she ceased resisting and decided to "give in" and to act as if she were "going to go along with him and enjoy it." *State* v. *Smith,* 210 Conn. 132, 137, 554 A.2d 713 (1989).

## VI

The defendant's final challenge to his conviction is that the trial court's admission of evidence of his post-arrest silence violated his state and federal constitutional privilege against self-incrimination and his right to due process of law. We conclude that no such violations occurred.

During the state's cross-examination of the defendant, he was questioned about what had transpired when the police arrived at his home, before they placed him under arrest. He testified that the police had informed him that they were investigating an incident that had occurred in Wallingford and that he had told them he would cooperate with them. He stated that he had admitted being in the Wallingford bar on the night in question and, when asked what he had done after he left the bar that night, he had responded that he went right home.

The state's attorney then attempted to impeach the defendant's credibility by reminding him that he had testified on direct that he had had a consensual sexual encounter with the complainant when he left the bar and had not gone directly home. The state's attorney then asked, "Because you didn't tell any of this to the police officers, did you?" to which the defendant responded, "No, I did not." The state's attorney then began to ask another question, "You never told the police officers at any time that this was—," but was interrupted by defense counsel's objection to the question. The trial court sustained the objection on grounds of relevancy and the prohibition announced in *Doyle* v. *Ohio,* 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), against the use of postarrest silence to impeach a criminal defendant's credibility.

On appeal, the defendant maintains that the first question should also have been excluded as an impermissible use of the defendant's postarrest silence. Although he acknowledges that it is not clear from the question whether the state's attorney was referring to the defendant's silence before or after he was arrested, he contends that the question reasonably could have been understood by the jury to encompass the defendant's postarrest silence. We agree that the question was ambiguous but believe that, given the context in which it was asked, it is more probable that it would have been understood to refer to the defendant's prearrest silence. The state's line of inquiry leading up to this question concerned the defendant's conduct when the police arrived at his home *before they placed him under arrest.* We conclude, therefore, that the defendant cannot prevail on this unpreserved claim of constitutional error because he has failed to demonstrate that the alleged constitutional violation clearly existed. *State* v. *Golding,* supra.

The judgment is affirmed.

In this opinion the other justices concurred.