STATE OF CONNECTICUT *v.* LUIS MARTINEZ
(AC 18051)

Lavery, Landau and Hennessy, Js.

---

Argued September 18—officially released November 17, 1998

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, was *Eva Lenczewski*, assistant state's attorney, for the appellee (state).

*Opinion*

LANDAU, J. The defendant, Luis Martinez, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a),[1] attempt to commit robbery in the first degree

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-134 (a) (2)[3] and felony murder in violation of General Statutes § 53a-54c.[4] On appeal, the defendant claims that the trial court (1) improperly denied his motion to suppress certain evidence because the affidavit in support of a search and seizure warrant failed to establish probable cause and (2) abused its discretion in admitting testimony that was irrelevant and prejudicial. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the resolution of this appeal. On September 15, 1994, the trial court issued a search and seizure warrant to search the first floor apartment at 54 Crown Street in Waterbury after determining that probable cause existed. The defendant's arrest stemmed from the seizure of a handgun, ammunition, bloody clothing, photographs and a wallet from the apartment following the execution of the warrant.

The defendant filed a motion to suppress[5] a revolver, a brown bloodstained sweatshirt with the word

---

[2] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[4] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he . . . causes the death of a person . . . ."

[5] The trial court concluded that since the defendant had his girlfriend's permission to stay at the apartment when no one else was home and authority

"Browns" printed in orange letters, photographs of the interior of the apartment and a black wallet containing personal papers belonging to the defendant that the state argued was seized under the plain view doctrine.[6] The trial court denied the motion to suppress as to the gun, ammunition and bloody clothing, but granted it as to the wallet and its contents because the plain view doctrine was inapplicable.[7] The trial court concluded that "the affidavit by the police officers plus the reasonable inferences necessarily drawn by the magistrate furnished a substantial factual basis for the magistrate's conclusion that probable cause existed to search for the gun, ammunition and bloody clothing." Other facts will be discussed where relevant to the issues in the case.

I

The defendant claims that the trial court improperly denied his motion to suppress the sweatshirt seized within the apartment. Specifically, the defendant claims that the affidavit in support of the search warrant (1) failed to establish probable cause and (2), in the alternative, was based on "stale" information.

The warrant application affidavit set forth the following facts. On September 14, 1994, an investigation led the police to the Crown Street apartment, the possible location of robbery suspects. After the police discovered that one of the residents, Demarise Williams, fit

to exclude other persons from entering the apartment, the defendant "had a reasonable expectation of privacy [in the apartment] and, therefore, [had] standing to bring these . . . suppression motions. . . ."

[6] The plain view doctrine establishes an exception to the warrant requirement and "is based upon the premise that the police need not ignore incriminating evidence in plain view while they are . . . entitled to be in a position to view the items seized." (Internal quotation marks omitted.) *State* v. *Eady*, 245 Conn. 464, 470, 733 A.2d 95 (1998).

[7] The defendant limits the present claim to the denial of the motion to suppress as to the sweatshirt.

the description of one of the robbery suspects, Williams was arrested under a valid arrest warrant for a separate incident. When questioned, Williams told police that he had knowledge of a recent homicide and robbery, and detailed the events that transpired on September 12, 1994.

Williams revealed that on September 12, 1994, at approximately 10 p.m., the defendant came into the apartment in Waterbury where Williams and his girl-friend, Darlene Saunders, were watching television. The defendant told Williams that he wanted Williams to go with him to rob a man who was sitting on the wall by a nearby church. Williams noticed that the defendant was in possession of a gun. The defendant and Williams walked to the church wall, which was located at the corner of Beacon and Crown Streets, a short distance from the apartment. Williams walked part of the way across the street with the defendant. The defendant walked up to the victim, stood directly in front of him and told him to take everything out of his pockets. When the victim failed to follow the directions, the defendant shot him twice.[8] Williams ran back to the apartment where he met Saunders. The defendant followed Williams to the apartment, where he talked and laughed about the shooting to Williams. The defendant then remained at the apartment.

The affidavit also contained information provided by Saunders regarding the defendant's presence in the apartment prior to and after the shooting. Saunders reported that upon the defendant's return to the apartment after the shooting, the defendant told her that he had shot a man six times in the chest. Although the victim had claimed to have no money, the defendant

---

[8] When the defendant initially pulled the trigger, the gun clicked but did not fire. The defendant then opened the cylinder of the gun, shut it and began firing at the victim.

told Saunders that he knew that the victim had money by the way he was patting his pockets. Saunders informed the defendant that she was going to see if anyone was hurt and then contact the police. The defendant told Saunders that if she informed the police, she would not leave the apartment alive. The following morning, on September 13, 1994, Saunders notified the defendant that the man he had shot the night before had died. The defendant left the apartment in the early afternoon.

## A

Initially, the defendant claims that the affidavit failed to set forth facts supporting a finding of probable cause for the seizure of the sweatshirt because there was no "credible or reliable information for the issuing magistrate to conclude there was a fair probability that bloody clothing would be found at that location."[9] Specifically, the defendant claims that the affidavit failed (1) to establish the defendant's relationship to the apartment, other than the fact that Williams lived there and that the defendant went there after the shooting, and (2) to provide any information indicating that the defendant was so close to the victim when he shot the gun that blood would be found on his clothing. We disagree.

"In *State* v. *Barton*, [219 Conn. 529, 544, 594 A.2d 917 (1991)], our Supreme Court adopted the 'totality of the circumstances' standard for determining probable cause used by the federal courts pursuant to the decision of the United States Supreme Court in *Illinois* v.

---

[9] Although the defendant makes reference to federal case law that developed the "totality of the circumstances" standard; see *Illinois* v. *Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); the defendant analyzes this claim using state case law. We, therefore, will analyze his claim as a matter of state law. See *State* v. *Otero*, 49 Conn. App. 459, 463 n.7, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998).

*Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)." *State* v. *Marsala,* 42 Conn. App. 1, 5, 679 A.2d 367, cert. denied, 239 Conn. 912, 682 A.2d 1010 (1996). "Under this [standard], in determining the existence of probable cause to search, the issuing judge must make a 'practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the "veracity" and the "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *State* v. *Johnson,* 219 Conn. 557, 563, 594 A.2d 933 (1991)." *State* v. *Rodriguez,* 223 Conn. 127, 134–35, 613 A.2d 211 (1992). Therefore, " '[i]f the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy . . . the magistrate can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists.' " *State* v. *Marsala,* supra, 6, quoting *State* v. *Barton,* supra, 544.

"[O]ne of the most common factors used to evaluate the reliability of an informant's information is the corroboration of the information by the police. . . . The theory of corroboration is that a statement [that] has been shown true in some respects is remarkably likely to be true in the remaining respects." (Internal quotation marks omitted.) *State* v. *Ruscoe,* 212 Conn. 223, 230–31, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). " 'When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the

magistrate.' " *State* v. *Marsala,* supra, 42 Conn. App. 6, quoting *State* v. *Barton,* supra, 219 Conn. 544–45.

"Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity; and (2) there is probable cause to believe that the items named will be found in the place to be searched." (Internal quotation marks omitted.) *State* v. *Marsala,* supra, 42 Conn. App. 6, quoting *State* v. *Barton,* supra, 219 Conn. 548. "Furthermore, it is axiomatic that [a] significantly lower quantum of proof is required to establish probable cause than guilt. . . . *State* v. *Vincent,* 229 Conn. 164, [172], 640 A.2d 94 (1994)." (Internal quotation marks omitted.) *State* v. *Bova,* 240 Conn. 210, 232, 690 A.2d 1370 (1997).

"This court's scope of review, in evaluating the existence of probable cause, is limited to the facts that appear [within] the four corners of the affidavit or facts that may be properly inferred from those facts. *State* v. *Couture,* 194 Conn. 530, 536, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). In so doing, we must use common sense; *State* v. *Castano,* 25 Conn. App. 99, 101, 592 A.2d 977 (1991); and defer to the reasonable inferences drawn by the [issuing] magistrate. *State* v. *Barton,* supra, 219 Conn. 544–45. Our role is to determine whether the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. *State* v. *Johnson,* supra, 219 Conn. 565. . . . *State* v. *Anziano,* [26 Conn. App. 667, 672, 603 A.2d 415 (1992)]." (Internal quotation marks omitted.) *State* v. *Marsala,* supra, 42 Conn. App. 7. "[T]he resolution of doubtful or marginal cases . . . should be largely

determined by the preference to be accorded to warrants." (Internal quotation marks omitted.) *State* v. *Barton,* supra, 552. Furthermore, "[a] reviewing court should not invalidate a warrant as long as the inferences drawn by the issuing magistrate are reasonable under all of the circumstances set forth in the affidavit regardless of whether that court would have drawn the same inferences." *State* v. *Marsala,* supra, 9, citing *State* v. *Barton,* supra, 545.

In the present case, the magistrate reasonably could have inferred that the information provided by Williams and Saunders was reliable. First, the warrant affidavit indicates that the investigation led the police to obtain information from Saunders that corroborated the information provided by Williams. With respect to Saunders, a citizen informant is "considered more deserving of credibility than are underworld informers, and courts have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility." *State* v. *Barton,* supra, 219 Conn. 542 n.10; see also *State* v. *Daley,* 189 Conn. 717, 723–24, 458 A.2d 1147 (1983). Second, the informants, Williams and Saunders, were not anonymous. "Because [their] identity was known to the police, the informant[s] could expect adverse consequences if the information that [they] provided was erroneous." *State* v. *Barton,* supra, 550. In Williams' case, his statement indicating his involvement in the events that transpired that evening constituted a declaration against penal interest. "Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search. . . . Although the informant's motive may be no loftier than the hope of leniency on other charges . . . courts have thought that one who knows the police are already in a position to charge him with a serious crime will not lightly undertake to divert the police down blind

alleys." (Citations omitted; internal quotation marks omitted.) Id., 551.

Even if we assume, arguendo, that the police investigation did not provide any corroboration of Williams' statement because, as the defendant claims, Williams' information was corroborated by Saunders, Williams' girlfriend. Because Saunders' motive to shift blame to the defendant categorizes her as being between a first time informant and a citizen informant, the magistrate could still reasonably have inferred that their statements were credible. While the affiants could have strengthened the warrant application through independent corroboration of some of the details contained within the affidavit, the affidavit sufficiently set forth underlying factual circumstances from which the police could have concluded that the informants were credible or that the information was reliable. See *State* v. *Barton,* supra, 219 Conn. 551. A review of the facts contained within the four corners of the affidavit indicates that the defendant was at the apartment with a gun before the shooting, was positioned directly in front of the victim when he shot him, returned to the apartment immediately after the shooting and remained at the apartment until the following afternoon.

"The nexus between the items sought and the place to be searched may be inferred from the type of crime, the nature of the evidence, the extent of an opportunity for concealment and normal inferences as to where a criminal would likely hide the item. . . . *State* v. *Vincent,* 30 Conn. App. 249, 257, 620 A.2d 152 (1993), aff'd, 229 Conn. 164, 640 A.2d 94 (1994)." (Internal quotation marks omitted.) *State* v. *Ives,* 37 Conn. App. 40, 46, 654 A.2d 789, cert. denied, 234 Conn. 906, 659 A.2d 1209 (1995). Although this could be considered a marginal case if we accept the defendant's argument that the information came from informants who were motivated to shift the blame to him and that there was a lack of

police corroboration,[10] the issuing magistrate reasonably could still have inferred that probable cause existed to issue the warrant. Specifically, the magistrate reasonably could have inferred that because the defendant shot the victim at close range, there was a fair probability that traces of blood would be on the clothing that the defendant was wearing that evening. Furthermore, because the defendant had remained in the apartment until the following afternoon, the magistrate reasonably could have inferred that there was a fair probability that the defendant normally spent time at this apartment and, therefore, that the clothing that the defendant had worn the previous day would be found within the apartment. After considering the search warrant affidavit under the "totality of the circumstances test," we conclude that the affidavit presented a substantial basis to support the magistrate's conclusion that the affidavit adequately described the basis of the informants' knowledge, as well as permitted a reasonable inference that the information was reliable. Accordingly, probable cause existed to search the apartment.

### B

The defendant claims in the alternative that even if the information in the affidavit is found to provide a substantial basis for believing that bloody clothing would be found at the apartment, the information was stale and, consequently, could not provide probable cause. The defendant concedes that this claim was not properly preserved at trial. The defendant maintains, however, that his claim is reviewable pursuant to *State*

---

[10] The defendant argues in his brief that Williams was motivated to shift blame to the defendant in light of the fact that the police had information independent of his admission that connected him to the shooting. Furthermore, Saunders' motivation to shift blame to the defendant stemmed from her role as Williams' girlfriend.

v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[11] We will review this claim because the record is adequate for review, and the defendant alleges the violation of his "fundamental constitutional right to be free from unreasonable searches unless supported by probable cause."[12] See *State* v. *MacNeil*, 28 Conn. App. 508, 519, 613 A.2d 296, cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992). The defendant's claim, however, fails because the alleged constitutional violation did not clearly exist and did not clearly deprive the defendant of a fair trial.

"It is undisputed that the determination of probable cause to conduct a search depends in part on the finding of facts so closely related to the time of the issuance of the warrant as to justify a belief in the continued existence of probable cause at that time. . . . Although it is reasonable to infer that probable cause dwindles as time passes, no single rule can be applied to determine when information has become too old to be reliable. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating

[11] "Under *Golding*, a defendant can prevail on an unpreserved claim of constitutional error only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Otero*, 49 Conn. App. 459, 463 n.6, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998).

[12] The defendant appears to assert in his brief that the admission of evidence that was improperly seized is subject to a claim that the seizure was done in violation of the fourth and fourteenth amendments to the United States constitution. Since the defendant analyzes his claim using state case law, however, we will analyze his claim as a matter of state law. See *State* v. *Otero*, 49 Conn. App. 459, 463 n.7, 715 A.2d 782, cert. denied, 247 Conn. 910, 719 A.2d 905 (1998).

conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Vincent*, supra, 229 Conn. 174.

"Consequently, whether a reasonable likelihood exists that evidence identified in the warrant affidavit will be found on the subject premises is a determination that must be made on a case-by-case basis. Accordingly, we have refused to adopt an arbitrary cutoff date, expressed . . . in days, weeks or months, beyond which probable cause ceases to exist. . . . Moreover, we have recognized that [i]f items of property are innocuous in themselves or not particularly incriminating and are likely to remain on the premises, that fact is an important factor to be considered in determining the staleness of a warrant." (Citation omitted; internal quotation marks omitted.) *State* v. *Bova*, supra, 240 Conn. 232–33.

In this case, the crimes occurred on September 12, 1994, the information was obtained from Williams and Saunders on September 14, 1994, and the search warrant was obtained on September 15, 1994. In that short period of time, it was not unreasonable for the magistrate to infer from the defendant's remaining at the apartment and warning Saunders that she would not leave the apartment alive if she contacted the police that he was comfortable remaining there and felt it was a safe place and, therefore, that the apartment was a logical place for the defendant to conceal anything connected to the crimes. "Such an inference is not certainty, but a certainty is not required." *State* v. *Couture*, supra, 194 Conn. 544.[13] We are of the opinion that

---

[13] The defendant argues in his brief that *State* v. *DeChamplain*, 179 Conn. 522, 427 A.2d 1338 (1980), rather than *State* v. *Couture*, supra, 194 Conn.

because it was reasonable for the magistrate to infer that the defendant's clothing may have contained traces of blood, but not necessarily to the point where it was inherently incriminating, the clothing had lasting value and was likely to remain in the apartment. See *State* v. *Ives*, supra, 37 Conn. App. 47 (probable cause dissipates less rapidly when item seized not "consumable or inherently incriminating").

The issuing magistrate, therefore, reasonably could have inferred that it was likely that the sweatshirt was in the apartment. Under the circumstances, we conclude that the three days between the night of the shooting and the challenged search did not render the information stale so as to preclude a finding that probable cause existed to issue a warrant. As a result, there was no clear constitutional violation, and the defendant was not clearly deprived of a fair trial.

II

The defendant finally claims that the trial court abused its discretion by (1) permitting the state to present the testimony of Chris Lovejoy when it was irrelevant and highly prejudicial and (2) admitting the testimony of a criminalist regarding the presence of blood and gunpowder residue on the sweatshirt because it was irrelevant and prejudicial. We disagree.

After Williams testified that the defendant was about four feet in front of the victim when he fired the gun and was wearing the Browns sweatshirt at the time of the

530, governs this case. In *DeChamplain,* our Supreme Court held that the affidavit was insufficient to support a finding of probable cause because there was insufficient evidence connecting the marijuana to the apartment; the defendant received a telephone call in the apartment regarding a drug transaction, but was not seen leaving the apartment carrying a package. *State* v. *DeChamplain,* supra, 524–32. In the present case, similar to *Couture,* the apartment was factually implicated in the defendant's criminal activity. See *State* v. *Couture,* supra, 545.

murder,[14] a state criminalist, Patricia Johannes, testified regarding evidence found on the sweatshirt.[15] Johannes testified that a stain on the left cuff of the sweatshirt tested positive for blood but was inconclusive as to the blood type, and that both cuffs and the front waistband area of the sweatshirt tested positive for nitrates and nitrites, thereby indicating gunpowder residue.[16] Love-

[14] Saunders also testified that the defendant was wearing a Browns brown and orange sweatshirt on the evening of September 12, 1994.

[15] Prior to Johannes' testimony, the defendant objected to the testimony that Johannes was about to provide because it called for speculation, as the blood could not be connected to the victim or the defendant and the nitrates and nitrites could not be connected to the gun or this type of gun. The trial court concluded that the "proffer reveals circumstantial evidence that the jury can ponder and determine and possibly make the inference that the state hopes for in terms of tying it to the defendant, and the imperfections, if any, as to certainty go to the weight and the cross-examination that may take place at the hands of the defendant."

[16] The following colloquy took place during the state's direct examination of Johannes:

"Q. And on what location of [the sweatshirt] did you locate . . . a stain [that tested positive for blood]?

"A. It was a stain that was located on the left cuff of the garment.
                                   * * *
"Q. And did you . . . perform further testing?

"A. Yes, I did. . . . The next test that I performed was a test for human hemoglobin. . . . If human hemoglobin was present in the sample, what I would see is a white band form between the two walls. And in this case, I did see that white band indicating to me that there was human blood in that stain.

"Q. And was your opinion based on a reasonable degree of scientific certainty?

"A. Yes, it was.

"Q. Did you perform additional testing . . . ?
                                   * * *
"A. The next test that I performed was I was looking for the ABO antigens in order to try to determine what ABO blood type would be present in this stain. . . . My findings were inconclusive.
                                   * * *
"Q. Did you also perform testing on the sweatshirt for gun residue?

"A. Yes, I did.
                                   * * *
"Q. And did you obtain any positive results in connection with that testing?

"A. Yes, I did. . . . Both of the cuffs were positive for nitrates and nitrites, and the front waistband area, just along the waistband."

joy later testified[17] that on the day before the murder, September 11, 1994, he saw the defendant on Beacon Street wearing a Cleveland Browns sweatshirt.[18]

"The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a show-

[17] The trial court overruled the defendant's objection to Lovejoy's testimony and concluded: "The confrontation clause guarantees the defendant only an opportunity for effective cross-examination, not cross-examination that is effective as the defense might wish. . . . Here, the court has sustained the defendant's objection to the state's use of misconduct evidence through the witness Lovejoy. That court ruling does not preclude Lovejoy's testifying that he saw a particular sweatshirt, which is already in evidence in this trial on [the defendant] the day before the crime alleged here. . . ."

[18] The following colloquy took place on the state's direct examination of Lovejoy:

"Q. And on Sunday, September 11 of 1994, where were you just before the noon hour?

"A. I was going toward my aunt's house.

"Q. And what street were you on?

"A. At the time I thought it was Crown, but I later found out it was Beacon.

\* \* \*

"Q. And I'm going to ask you to look around the courtroom; do you see a person that you saw on September 11, 1994, in the courtroom today?

"A. Yes, I do.

"Q. And would you point out the person . . . .

\* \* \*

"A. He's seated on that side right there.

"[Assistant State's Attorney]: Your Honor, I'd ask that the record reflect he has identified the defendant.

\* \* \*

"The Court: It may so reflect.

"Q. And on September 11 of 1994, did you have a chance to observe any of the defendant's clothing that day?

"A. Yes, I did.

"Q. And what parts of his clothing do you remember?

"A. His shirt.

"Q. Okay. Can you describe his shirt?

"A. It was a Cleveland Browns shirt. It was a brown shirt with orangish-red letters.

"Q. And what kind of shirt was it, a button-down or—

"A. No, it was just like a sweatshirt, like a hooded sweatshirt."

ing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998). "Evidence is considered relevant when it tends to establish the existence of a material fact or to corroborate other direct evidence in the case." (Internal quotation marks omitted.) *State* v. *Garcia*, 37 Conn. App. 619, 634, 657 A.2d 691, cert. denied, 234 Conn. 917, 661 A.2d 97 (1995). Furthermore, relevant evidence "has a logical tendency to aid the trier in the determination of an issue." *State* v. *Jeffrey*, 220 Conn. 698, 704, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992).

## A

The defendant claims that the trial court abused its discretion by permitting the state to present the testimony of Lovejoy because it was irrelevant and prejudicial to the defendant. Specifically, the defendant claims that the testimony was irrelevant because it was not connected to the issue of whether the defendant shot the victim on September 12, 1994.

Lovejoy's testimony tended to support or corroborate the existence of other direct evidence in the case supplied by Williams and Saunders that the defendant wore a Browns sweatshirt on the evening of September 12, 1994. As such, it was relevant and properly admissible. We conclude, therefore, that the trial court did not abuse its discretion in permitting the state to present Lovejoy's testimony.

B

The defendant claims that the trial court abused its discretion by admitting the testimony of Johannes because it was irrelevant and prejudicial. Specifically, the defendant argues that the testimony lacked a sufficient connection to the crimes or the defendant.

In *State* v. *Jeffrey*, supra, 220 Conn. 704–705, the defendant argued that a urine stained blouse should have been excluded as irrelevant because the state criminalist's testimony did not exclude the possibility that the urine was from a source other than the defendant. The defendant argues that *State* v. *Moody*, 214 Conn. 616, 573 A.2d 716 (1990), rather than *Jeffrey*, controls this case. In *Jeffrey*, our Supreme Court distinguished *Moody*, as we do in this case, because in *Moody* it could not be determined whether a stain on the defendant's shoe was blood. The *Jeffrey* court held that "[t]he uncontroverted evidence of urine, not just something that might or might not have been urine, distinguishes this case from *Moody* and leads us to conclude that the shirt and test results were properly admitted into evidence." *State* v. *Jeffrey*, supra, 705.

In this case, while the findings were inconclusive as to the blood type, Johannes was able positively to identify human blood in the stain on the sweatshirt. Furthermore, while it is true that evidence of human blood on the sweatshirt does not by itself indicate that the defendant caused the stain or exclude other possible explanations for its presence, these objections do not require its exclusion because "evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion, even to a slight degree." (Internal quotation marks omitted.) Id., 706. As such, to be relevant and properly admissible, it was not necessary that the evidence prove conclusively that the defendant's or the victim's blood was on the

sweatshirt, but only that the testimony to some degree tended to support Williams' testimony that the defendant was about four feet in front of the victim when he fired the gun. See id. We conclude, therefore, that the trial court did not abuse its discretion in admitting Johannes' testimony.

The judgment is affirmed.

In this opinion the other judges concurred.