******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* ANDRE D. WHITE
## (AC 42471)

Keller, Prescott and Moll, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of home invasion, robbery in the first degree, conspiracy to commit burglary in the first degree and tampering with a witness, the defendant appealed to this court. The defendant's conviction stemmed from an incident in which he and two other men, D and L, pursuant to their plan to commit a home invasion and robbery, followed the victim to his residence, forced him into the residence at gunpoint and robbed him of various possessions, including his credit and ATM cards, two rifles, a box of shotgun shells, and a vase containing approximately $75 in coins. During their investigation, the police obtained a warrant to search the defendant's residence and to seize any items that were described in the warrant application and supporting affidavit as either having been removed from the victim's residence or used or worn by the defendant during the commission of the home invasion. Upon execution of the warrant, the police seized several items, including a box of 20 gauge shotgun shells and a black ski mask. Prior to trial, the defendant filed a motion to suppress any and all evidence that the police seized from his residence. The trial court denied the motion, concluding, inter alia, that the search warrant was supported by probable cause. During the trial, the state called D, who testified in detail about the events leading up to and including the home invasion, and the defendant's involvement therein. D also testified that he had entered into a plea agreement with the state, pursuant to which he pleaded guilty to the crime of burglary in the first degree and agreed to testify for the state in exchange for a sentence of between seven and nine years of imprisonment. The plea agreement, which was admitted into evidence without objection, expressly provided that the ultimate decision as to the sentence that D received would be decided by the judge who presided over the defendant's trial, after consideration of the credibility of D's testimony at trial, as well as other factors. On appeal, the defendant claimed that he was deprived of a fair trial as a result of prosecutorial impropriety and that the court improperly denied his motion to suppress the evidence that was seized pursuant to the search warrant. *Held*:

1. The defendant could not prevail on his unpreserved claim that prosecutorial impropriety that occurred during the state's examination of D and closing argument deprived him of a fair trial:

   a. Contrary to the defendant's claim, the prosecutor's inquiry during his redirect examination of D about D's reasons for entering into the plea agreement with the state, which elicited testimony from D that the prosecutor had not made an offer until he was satisfied that D was being truthful, was not improper; the prosecutor's inquiry was based on the evidence and did not suggest that the prosecutor was vouching for D's credibility on the basis of facts outside of the record.

   b. The defendant's claim that the prosecutor improperly vouched for D's credibility during the state's rebuttal closing argument was unavailing: the prosecutor's reference to the fact that D's plea agreement required the presiding judge to make a determination of D's credibility was based on the evidence and did not suggest to the jury either that the court already had found D to be credible or that the jury was not required to evaluate D's credibility because the court would do so; moreover, contrary to the defendant's assertion, certain challenged arguments of the prosecutor concerning D and the plea agreement were not an attempt by the prosecutor to inject his credibility into the trial or to ask the jury to trust his professional judgment and integrity when assessing D's credibility, as the arguments were properly limited to the evidence and the rational inferences to be drawn therefrom; furthermore, the prosecutor did not mischaracterize defense counsel's arguments that the state had "bought and sold" D's testimony and that the prosecutor was supporting perjury, the prosecutor having properly attempted

to refute these challenges to D's testimony by arguing that because the plea agreement was contingent on D testifying credibly, it did not logically provide him with a motive to be untruthful, and there was no merit to the defendant's contention that the prosecutor vouched for D by suggesting that, by testifying, he risked being prosecuted for perjury.

2. The trial court properly denied the defendant's motion to suppress evidence that was seized pursuant to the search warrant, the warrant having been supported by probable cause: the defendant could not prevail on his unpreserved claim that the facts set forth in the search warrant affidavit did not provide probable cause to believe that he would have retained the items sought to be seized in his residence four months after the home invasion, because the affidavit set forth facts that either implicated the defendant as a participant in the home invasion or as being in the company of L, who was known to be a participant, shortly after the home invasion occurred, it was reasonable to infer that the defendant may have possessed items taken from the victim's residence or that he possessed devices, such as a cell phone, that would have been used in the commission of the crime, and, on the basis of certain averments set forth in the affidavit, it was reasonable to infer that, four months after the home invasion, the defendant probably possessed a cell phone or a GPS device that he had possessed at the time that the crime occurred, that he still would have possessed the types of items that were stolen from the victim and that, in light of the variety of the items taken, one or more of the items would be kept by the defendant in his residence, and the judge who issued the search warrant reasonably could have relied on the training, experience and expertise of the detective affiants in this regard; moreover, the defendant's contention that the facts set forth in the affidavit were insufficient to demonstrate that he was a participant in the home invasion because the facts concerning his friendship with L and his presence with him at a supermarket on the morning following the home invasion reflected innocent behavior that did not give rise to a suspicion that he was a participant was unavailing, as it was reasonable to infer, in light of other facts in the affidavit, that the defendant's act of exchanging approximately $68 in coins by means of the supermarket's Coinstar machine, which was recorded by the store's surveillance camera, was suspicious and tended to give rise to probable cause that he possessed evidence related to the home invasion, and the affidavit reflected that, while the defendant was cashing in the receipt for the coins, L was at a cash register attempting to use the victim's stolen credit card; furthermore, the finding of probable cause to issue the search warrant did not depend on facts in the affidavit that tended to demonstrate that the defendant was a perpetrator of the home invasion, and the affiants presented facts that gave rise to a probability that the defendant was in possession of items connected with the home invasion not only due to his participation in the criminal endeavor but also due to his relationship with and activities with L, who was identified as a suspect in the crime within hours of its commission.

Argued September 9, 2019—officially released February 11, 2020

*Procedural History*

Substitute information charging the defendant with two counts of the crime of robbery in the first degree, and with the crimes of home invasion, conspiracy to commit burglary in the first degree and tampering with a witness, brought to the Superior Court in the judicial district of Litchfield at Torrington, where the court, *Danaher, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the matter was tried to the jury before *Dooley, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *David S. Shepack*, former

state's attorney, and *David R. Shannon,* senior assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Andre D. White, appeals from the judgment of conviction, rendered following a jury trial, of home invasion in violation of General Statutes § 53a-100aa (a) (1), robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), robbery in the first degree in violation of § 53a-134 (a) (2), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (3), and tampering with a witness in violation of General Statutes § 53a-151.[1] The defendant claims that (1) prosecutorial impropriety that occurred during the prosecutor's examination of a witness, as well as during the state's closing argument, deprived him of his right to a fair trial, and (2) the court improperly denied his motion to suppress evidence that was seized pursuant to a search warrant that was not supported by probable cause. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. Early in 2013, the defendant, Henry Le, and Trayvon Dunning were serving time as inmates at the same correctional facility. During this time, the three men agreed to commit home invasions following their release from prison.[2] Following the release of the defendant and Le, Dunning was released on March 28, 2013. Thereafter, the defendant, Le, and Dunning refined their plan. The men agreed that they would identify a suitable victim in public, follow the victim home, and commit a robbery at his or her residence. In preparation to carry out their plan, in early April, 2013, they purchased items at a home improvement store, including masks, gloves, and zip ties.

Late in the day on April 7, 2013, Dunning was driving an automobile on Interstate 84 in Hartford, and the defendant and Le were his passengers. The three men observed the victim, Peter Brown, who was driving a BMW sport utility vehicle. The men decided to follow the victim after observing that he appeared to be alone, that he was a white male in his forties or fifties, and he was driving an expensive automobile. The men followed the victim from Hartford to his residence in New Hartford.

The victim arrived at his residence at approximately 11:30 p.m. As the victim approached the back door of his residence, the defendant, Le, and Dunning, all of whom had their faces concealed, confronted him. The victim was approached first by two of the three men, one of whom was brandishing a gun. They ordered the victim to put his "hands up." The third man, with his face covered, then approached the victim from his right side. The men ordered the victim to give them his wallet and his cell phone. At gunpoint, the victim complied. The men then asked the victim whether anyone was

inside his residence and whether he had a dog or an alarm system. After the victim informed them that nobody else was at home and that he did not have an alarm system, the men forced the victim inside his residence.

For the next forty-five to fifty minutes, the defendant, Dunning, and Le confined the victim to a chair in his kitchen. They searched the contents of an overnight bag that the victim had been carrying. They repeatedly asked the victim if he owned a safe, to which he replied, no. They removed a credit card and an automatic teller machine (ATM) card from his wallet. One of the men demanded the victim's ATM card's pin number. The victim replied that he was only able to remember the letters corresponding to his pin number, but not the number itself. Because he was terrified by the circumstances, the victim had difficulty converting the letters into a number. One of the men ripped a telephone off the wall and demanded that he provide them with the number. After the victim provided the pin number, Le demanded the keys to the victim's automobile, asked him where the nearest ATM was located, and left the residence. Le returned to the victim's residence a short time later after having withdrawn funds from the victim's bank account at an ATM in New Hartford.[3]

While one of the three men held the victim at gunpoint in his kitchen, they each took turns ransacking every room of his residence in search of valuables. The men brought various items to the kitchen. Thereafter, Dunning parked his automobile in the victim's driveway. While the victim continued to be held at gunpoint, as he had been throughout the entire incident, the men carried several of the victim's possessions to Dunning's automobile. Among the possessions removed from the residence were an overnight bag, two long rifles, a box of shotgun shells,[4] camera equipment, a gold watch, a laptop computer, a hunting knife, and a large vase that contained approximately $75 in coins.[5]

After the victim was ordered to turn around, the defendant, Le, and Dunning exited the residence. They then quickly fled from the scene in Dunning's automobile.[6] The victim went to his neighbor's residence to request help. The victim's neighbor called 911, and the police arrived on the scene quickly thereafter.

Following the defendant's arrest and while he was awaiting trial on the charges at issue in the present appeal, he had conversations with others in an attempt to persuade Dunning not to testify against him. During a recorded telephone conversation with the mother of Dunning's child, a person who was identified at trial as "Jasmine," the defendant explained that Dunning had provided the police with a statement that implicated him. The defendant asked Jasmine to pressure Dunning not to testify, stating that Jasmine "don't like no . . . snitches." He asked Jasmine to tell Dunning that testi-

fying against the defendant would harm his relationship with her. He cautioned Jasmine not to let Dunning know that he called her and stated that, if Dunning knew about the call, he would "go back to the court and tell them."

The next day, the defendant attempted to speak with Jasmine a second time. Instead, he reached her boyfriend by telephone, and Jasmine's boyfriend did not permit the defendant to speak directly with her. The defendant told Jasmine's boyfriend that it was foolish for Dunning to cooperate with the prosecution and that he wanted Jasmine to prevent Dunning from testifying. He stated that the "best bet [was for Dunning] to not testify at all." He explained that if Dunning invoked his fifth amendment privilege against self-incrimination, then "they can't do shit to him." The defendant also stated that he would be offered a favorable plea deal if Dunning refused to testify. The defendant stated that he could have people "put hands on" Dunning, but he was "just trying to save [Dunning] from getting touched . . . [as he was] not trying to go that route . . . ."[7] Dunning testified on behalf of the state at trial. Additional facts will be set forth as necessary.

I

First, the defendant claims that prosecutorial impropriety that occurred during the state's examination of Dunning, as well as during the state's closing argument, deprived him of his right to a fair trial. We disagree.

The defendant's unpreserved claim[8] focuses on the prosecutor's examination of Dunning, as well as arguments made by the prosecutor during the state's rebuttal closing argument. With respect to the examination of Dunning during trial, the following additional facts are relevant to the present claim. Dunning was called as a witness by the state during its case-in-chief. Dunning appeared in prison garb and, at the very beginning of his direct examination by the state, the prosecutor elicited testimony that he was incarcerated as a result of the role he played in the incident giving rise to the charges that were brought against the defendant, namely, the 2013 home invasion that occurred in New Hartford. During his testimony, he stated that he had entered into a plea agreement with the state pursuant to which he pleaded guilty to a single criminal offense—burglary in the first degree—and he agreed to testify in the defendant's case in exchange for a sentence of between seven to nine years of imprisonment. Dunning testified that, at the time of the defendant's trial, he was awaiting sentencing. Without objection, a copy of the written plea agreement was admitted into evidence and read aloud by the courtroom clerk in the presence of the jury. In relevant part, it stated that "the ultimate decision regarding the sentence [Dunning] receives will be made by the sentencing judge, the Honorable Kari Dooley, after consideration of the credibility of his testimony"

at the defendant's trial, as well as other factors.

Thereafter, during the state's case-in-chief, Dunning testified about the events leading up to and including the home invasion. In relevant part, he testified that while he was incarcerated with the defendant and Le, the three men planned to commit home invasions following their release. Shortly after Dunning was released on March 28, 2013, he, the defendant, and Le prepared to carry out their plan by purchasing items at a home improvement store. On April 7, 2013, accompanied by the defendant and Le as his passengers, Dunning drove behind the victim, following him to his residence in New Hartford. Dunning testified that when he arrived at the victim's residence, "we all jumped out . . . got on [the victim's] porch, searched his pockets, got his stuff, I opened his door, got him inside, sat him down and we all just searched the house for his stuff." He stated that, while the victim was held at gunpoint for approximately forty-five minutes to one hour, he, the defendant, and Le searched the residence for valuables.[9] During this period of time, Le left briefly to visit an ATM for the purpose of withdrawing money by means of the victim's card. Dunning testified that after many of the victim's possessions, including guns and camera equipment, were placed into the trunk of his automobile, he drove away from the scene with the defendant and Le.

Dunning testified that in July, 2013, he learned that the police were interested in speaking with him and that they had executed a search warrant at his residence. He voluntarily met with the police and, after they showed him photographs that incriminated him, the defendant, and Le, he provided a statement about the events at issue. Dunning provided the police with the names of the defendant and Le. He testified that, later, he met with the police once again, was transported to a police station, and provided the police with a second statement. He testified that he had "kind of lied a little bit" in his police statements with respect to whether he had entered the victim's residence. He testified that although he had accurately told the police that he was with the defendant and Le on the night of the home invasion and that he drove Le and the defendant to the victim's residence, he had inaccurately told the police in these statements that he had merely waited outside of the victim's residence during the commission of the home invasion. He said that he had been untruthful about the extent of his role in the crimes because he was trying to avoid more serious charges.

Defense counsel cross-examined Dunning. Dunning testified that he was arrested on August 9, 2013, and charged with several crimes, but that he did not enter into the plea agreement with the state until March 17, 2017. He testified that, pursuant to the agreement, several charges would not be pursued by the state.[10]

Defense counsel asked Dunning why it took so long for him to enter a guilty plea. Dunning explained that he was looking for the best plea deal that he could obtain and that he "took the best option" that was made available to him. He stated: "I wanted to fight and see if I can get less than they were offering, but it didn't work. They kept offering the same thing, so I took the best route I could."

Defense counsel also questioned Dunning about the two written statements that he had provided to the police. Dunning agreed with defense counsel that, in the statements, he had sworn to be truthful but, nevertheless, had misrepresented the extent of his role in the crimes that took place at the victim's residence. Defense counsel asked Dunning when he had first admitted to the police that he had entered the victim's residence. Dunning testified that he made this admission the month prior to the trial, when he had additional plea negotiations with the state.

During the state's redirect examination of Dunning, the prosecutor further questioned him about the circumstances surrounding his plea agreement with the state. In relevant part, Dunning testified that he was arrested approximately five months after the home invasion occurred. There was no objection and the following examination of Dunning then occurred:

"Q. Now . . . were there negotiations between your attorney and the prosecutor who was handling the case at that time, to your knowledge?

"A. No.

"Q. No negotiations. Was the state . . . either I or the other prosecutor who initially handled the case, willing to enter into an agreement if you weren't telling the truth?

"A. Could you repeat the question, please?

"Q. Is the agreement you entered into with the state . . . contingent upon you telling the truth?

"A. Yes.

"Q. And you never entered into an agreement with the state until last month, correct?

"A. Yes.

"Q. And is it correct that last month was the first time you told anyone from the state, police, prosecutor's office that you went into that house, correct?

"A. Yes.

"Q. So, the agreement wasn't entered into until you told the state you went into that house?

"A. Yes.

"Q. Are you aware or have you read some of the police reports about this case?

"A. Yes.

"Q. [D]o you know whether or not the victim was always claiming three people went in the house?

"A. As far as I know, he said three people were in the house."

Defense counsel did not object to this line of questioning by the prosecutor.

Because the defendant's claim of prosecutorial impropriety is based, in part, on the prosecutor's arguments during the state's rebuttal closing argument, we next set forth relevant portions of the arguments advanced before the jury. During the state's initial closing argument, the prosecutor did not comment on Dunning's plea agreement with the state. During the defendant's closing argument, defense counsel focused on the issue of Dunning's credibility, arguing in relevant part as follows: "Dunning testified and points the finger at [the defendant]. What we know is that . . . Dunning gave a statement early on, close in time to the crime. Gave a wonderful statement, minimizing his whole participation, basically telling an untruth to the police. In his second statement [he] still minimized his participation and wasn't truthful with the police . . . he told the police he never entered the house. Why did he do that? I think he said that . . . he thought it would be less onerous on him and wouldn't be as serious. If . . . Dunning admits to a crime in basically August of 2013, he enters a guilty plea in March of 2017. You remember I asked him why it took so long for him to enter a plea, and my interpretation of his body language is he froze. He didn't know what to say. . . . Dunning is a convicted felon. . . . Dunning basically told untruths to the police until he could work a good deal. And a deal he worked out. A deal that . . . makes Filene's Basement look like Macy's. He entered into an agreement that was entered into evidence with the state of Connecticut. And the first two words are 'in consideration.' This is a sales agreement. . . . The testimony changed hands. In my opinion . . . Dunning's testimony is completely suspect because it's purchased. He stole his testimony. He waived it. He wasn't stupid. He waited, knowing that [the state] needed his testimony. You heard me ask him how many charges he'd been charged with, and he listed a whole bunch of serious charges. They're all going away. In exchange for his testimony, he goes to jail for no less than seven or more than nine years. That's a bargain basement deal. A deal he made with the state, knowing that it was false, but it worked out for him. And as a defense lawyer, I say good for him. Well, as [the defendant's] lawyer, I say don't convict a man based on the testimony of a lie or someone who sells his testimony. He took . . . almost four years to enter a plea. . . .

"Dunning's whole testimony is suspect because . . .

he doesn't tell the truth close in time to when he first was interrogated by the police, which was the closest [point] in time to the crime. He waits . . . looking for a good deal, and he finally gets one, knowing that [the defendant], who wasn't part of the crime, is willing to go to trial, and they're going to need his testimony to convict him.

"[There was evidence that Le received a suspended sentence after fourteen years served.] Dunning knows that. He gets a deal of half that time—good for him. He gets home soon and all he had to do was wait, hold out and enter into a sales agreement with the state of Connecticut. They purchased his testimony, he sold it, and he gets the good deal. He gets the profit."

In the state's rebuttal closing argument, the prosecutor responded to these arguments, in relevant part, as follows: "[L]ook how vociferously . . . Dunning was criticized in this case. . . . Dunning's testimony, the state argues, is enough to convict [the defendant] . . . and [defense counsel] wants to say I bought and sold that testimony, that I'm supporting perjury. . . . And what motive does [Dunning] have to lie at this point? Why would he? [Defense counsel] wants to say it's because he's getting a sweetheart of a deal, this great deal. He's back in jail. He's going to be back in jail from anywhere from seven [to] nine years, and that's not up to me, it's not based on my recommendation, it's up to the judge, who heard his testimony. The judge is in the best position to evaluate his credibility, his truthfulness. So, why would he come in here and say it was [the defendant] . . . ? Why would he do that? And risk getting two more years in jail . . . getting nine years and seven or getting eight or getting charged with perjury, false statement? Yet, he did, when he gave his initial statement, he didn't tell the police that he went in the house, but he told the police he was there, he told the police he was the driver and he told the police who he was with. Did he minimize his role? Absolutely. Is that dishonest? Yep. . . . And then some months later, when the police had him arrested, then he gave another statement . . . . Did he make a mistake in not telling 100 percent of the truth? Yep. Was that dishonest? Yes. But do you throw away his entire testimony because of that? No, you don't have to. The state's argument is you shouldn't, you shouldn't. . . . And you're being told to discredit totally what [Dunning] said, that that testimony has been bought and sold by the state. . . .

"Oh, the deal, the deal. [Dunning] waited and waited and waited until he struck this fabulous deal. . . . I think it came out and, you now, you guys have to connect the dots to a certain degree. You know you look at the facts and what reasonable inferences you can draw from the facts. But . . . Dunning testified . . . the first time he ever told anyone from law enforcement, the state's attorney's office, or the police that he did in

fact go into that house, and we know that three people went into the house because that's what [the victim] said. The first time, it was only after that point in time that the deal was struck. So, in deciding whether or not the state cut some deal with him to lie [with respect to the defendant] and give false testimony, would you want the state of Connecticut to enter into and to deal with somebody who's assisting, aiding, [going] into that house, when all of the evidence makes it clear they did? And that deal that's in evidence is conditioned on him being 100 percent truthful. It says something to that effect. It's in evidence, you can read it. So, was it that he was waiting and waiting and waiting until the numbers were right, or is it that he had to come clean first, to tell the truth, 100 percent truth or some combination of the two?

"[Dunning], why would he, if he was going to lie, why would he come here . . . and he knows the judge is the one who decides whether he gets between seven and nine? Why would he come in and say, I was the one with the gun, holding on [the victim]? Why would he admit to that? [The victim] can't . . . identify him through his gun. He's making himself look worse so, in evaluating his credibility, consider that."

Defense counsel did not object to the prosecutor's argument in this regard.

With respect to the prosecutor's redirect examination of Dunning, the defendant argues that, although it was proper for the prosecutor to disclose the existence of the plea agreement that the state had entered into with Dunning, it was a form of improper vouching for the witness for the prosecutor to have elicited testimony from Dunning that "the prosecutor had not made an offer until he was satisfied that Dunning was telling the truth." The defendant argues that the prosecutor's inquiry about the reasons for the plea agreement and Dunning's testimony in response impermissibly suggested that the state had "verified [Dunning's] veracity before reaching an agreement." According to the defendant, "[t]he state should not have implied or stated that it would not offer Dunning an agreement until it believed Dunning was being truthful."

With respect to the arguments made by the prosecutor during the state's rebuttal argument, the defendant asserts for the first time on appeal that the prosecutor improperly vouched for Dunning's credibility in several ways. The defendant correctly observes that the plea agreement that was admitted into evidence without any objection referred to the fact that Judge Dooley, the judge who presided over the defendant's trial, would determine whether Dunning testified credibly at the defendant's trial, and, thereafter, the court would make the ultimate decision regarding the sentence to be imposed on Dunning. The defendant argues that the prosecutor's references to the fact that the court, and

not the prosecutor, would evaluate the credibility of Dunning's testimony and whether Dunning was entitled to the benefit of the plea agreement were improper because they invoked the integrity of the court in support of Dunning's credibility. Moreover, the defendant argues that, although it would have been proper for the prosecutor to refer to the fact that *a* judge would determine whether Dunning had testified credibly, it was improper for the prosecutor to state that *the judge who was presiding over the defendant's trial* would make that determination. According to the defendant, "[t]o tell the jury that *this* judge, the judge presiding over the case before the jury, is evaluating [Dunning's] credibility undermine[d] the jury's role as sole judge of the facts" and implicitly suggested that it was not in the best position to evaluate Dunning's credibility. (Emphasis in original.)

The defendant argues that, in addition to bolstering Dunning's testimony by referring to the court's evaluation of his testimony, the prosecutor's arguments impermissibly suggested that the state would not have entered into the plea agreement with Dunning unless he, or the state, had determined that Dunning's testimony was credible. The defendant asserts that the prosecutor improperly referred to the fact that he had not supported perjury by presenting Dunning's testimony and improperly argued that Dunning was not offered the plea agreement until Dunning had "come clean first, [told] the truth, [and was] 100 percent" truthful. By these arguments, the defendant asserts, the prosecutor essentially turned an evaluation of Dunning's testimony or the defendant's innocence into a referendum on the integrity of the prosecutor. Thus, the defendant argues that the prosecutor "put his own credibility in issue, implicitly and expressly asking the jury to trust his professional judgment and integrity in deciding when to make an offer to Dunning. Although the prosecutor expressly referred only to when Dunning's testimony matched [the version of events to which the victim testified], the jury may have inferred that his decision also derived from his or her secret knowledge of facts not in evidence."

Finally, the defendant argues that the prosecutor improperly vouched for Dunning's credibility by suggesting that Dunning was credible because he did not want to risk receiving a longer sentence for having committed perjury at the defendant's trial. The defendant argues that, although it would have been proper for the prosecutor to refer to the plea agreement and to ask Dunning if he understood the consequences of breaching the agreement by testifying untruthfully, the prosecutor's argument in the present case was improper because it suggested "that the prosecutor knows if the witness is telling the truth or [implied] that he possessed information not presented to the jury that would enable him to know if the witness were lying."

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . [T]he defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . .

"In determining whether the defendant was deprived of his due process right to a fair trial, we are guided by the factors enumerated by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case. . . . [A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Sinclair*, 332 Conn. 204, 236–37, 210 A.3d 509 (2019).

"We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence [on] jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. . . . That is not to say, however, that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Indeed, this court give[s] the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or contin-

ually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 435, 64 A.3d 91 (2013).

In addressing claims of improper vouching, our Supreme Court has explained that "it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. . . . [H]owever . . . [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 47, 917 A.2d 978 (2007). "In claims of improper vouching, our Supreme Court has noted that the degree to which a challenged statement is supported by the evidence is an important factor in determining the propriety of that statement. The Supreme Court [has] stated that [a] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 812, 971 A.2d 781, cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009).

We reject the defendant's claim that the prosecutor's redirect examination of Dunning suggested to the jury that, while relying on facts outside of the evidence, the prosecutor had injected his personal belief that Dunning was truthful. In the portions of the redirect examination on which the defendant focuses, the prosecutor elicited testimony from Dunning that his plea agreement was contingent on his testifying truthfully, he did not enter into the plea agreement until the month prior to the defendant's trial, he did not tell anyone from the state or the prosecutor's office that he had entered the victim's residence until the month prior to the defendant's trial, and the plea agreement was not finalized until he admitted that he had entered the victim's residence. We observe that this line of questioning directly followed the defendant's cross-examination of Dunning, during which defense counsel asked Dunning about the plea agreement and to explain why he had waited so long following his arrest to enter a guilty plea, and why, in his statements to the police, he had been untruthful about having entered the victim's residence with the defendant and Le.

Further, we conclude that there was an evidentiary basis for all of the prosecutor's questions. During Dunning's direct examination, without any objection, the plea agreement was admitted into evidence. It plainly stated that the consideration being promised to Dunning by the state was contingent on a finding by the sentencing judge that Dunning had testified truthfully. The timing of the plea agreement, which was signed on March 17, 2017, was readily apparent to the jury, as

well. The agreement was not entered into until shortly before the defendant's trial, which began on March 29, 2017. The inquiries or testimony with respect to the fact that Dunning did not tell anyone from the state or the prosecutor's office that he had entered the victim's residence until the month prior to the defendant's trial and that the plea agreement was not finalized until he admitted that he had entered the victim's residence hardly suggested, as the defendant argues presently, that the prosecutor had "verified [Dunning's] veracity" by using a litmus test that was hidden from the jury. Instead, the reason for the state's willingness to enter into the agreement was readily apparent and based on the evidence. Specifically, during the victim's testimony, which preceded Dunning's testimony, he testified that three masked men had approached him as he was entering his residence, had held him at gunpoint, had ransacked his residence, and had left his residence with many of his possessions. Immediately after asking Dunning about the timing of the agreement, the prosecutor asked him whether he was aware from the police reports in this case that "the victim was always claiming three people went in the house," to which Dunning replied, "[a]s far as I know he said three people were in the house."

The elicited testimony from the victim and Dunning strongly suggested that the state did not enter into the agreement until after Dunning's version of events was consistent with the victim's version of events. Because the prosecutor's inquiry was based on the evidence and did not suggest that the prosecutor was vouching for Dunning on the basis of facts that did not appear in the record, we conclude that the inquiry was not improper.

Next, we turn to the challenged remarks made by the prosecutor during the state's rebuttal closing arguments. To a great extent, the defendant challenges the propriety of the prosecutor's references to the terms of the plea agreement, which was admitted into evidence without any objection. Essentially, the defendant argues that, by referring to the fact that the plea agreement required Judge Dooley to make a determination of Dunning's credibility, the prosecutor either attempted to persuade the jury that the court already had found Dunning to be credible or that he suggested that the court, and not the jury, was the arbiter of Dunning's credibility. We conclude, however, that the challenged argument was based on the evidence. The plea agreement provides that Dunning "is to cooperate completely and truthfully in any investigations, hearings, or trials relating to [the defendant], including the giving of truthful sworn testimony." Additionally, the agreement provides that Dunning "understands that the ultimate decision regarding the sentence he receives will be made by the sentencing judge, the Honorable Kari Dooley, after consideration of the credibility of his testimony . . . ." Nothing about the prosecutor's arguments suggested

that, at the time of the trial, the court had made any type of finding concerning Dunning's credibility. Nor did the arguments suggest that the prosecutor had a personally held opinion concerning Dunning's credibility. To the contrary, the prosecutor did not stray from the terms of the plea agreement by informing the jury that, with respect to the issue of whether Dunning would be entitled to the benefit of the agreement he reached with the state, it was up to Judge Dooley to determine if he was credible and to impose an appropriate sentence.[11] The prosecutor explicitly stated, in accordance with the agreement, that these decisions with respect to Dunning were not based on his personal recommendation. Moreover, it belies a rational interpretation of the prosecutor's arguments concerning Dunning, which were an obvious attempt to persuade the jury *that it should conclude* that Dunning was a credible witness, to suggest that the prosecutor had attempted to persuade the jury that it was not required to evaluate Dunning's credibility because the court would do so.[12]

The defendant's arguments also focus on what he considers to be an attempt by the prosecutor to inject the prosecutor's credibility into the trial. According to the defendant, the prosecutor's arguments concerning Dunning intertwined an assessment of Dunning's credibility with the prosecutor's own credibility and integrity. For the reasons we already have discussed, we interpret the prosecutor's arguments as properly limited to the evidence and the rational inferences to be drawn therefrom. At no point did the prosecutor ask the jury, as the defendant suggests, "to trust his professional judgment and integrity in deciding when to make an offer to Dunning." The argument with respect to the plea offer was based on the evidence and, in particular, the testimony that the offer was made only after Dunning presented the state with a version of events that was consistent with the victim's version of events and, thus, accurately reflected his involvement in the home invasion.

The prosecutor did not mischaracterize the arguments advanced by defense counsel that the state had "bought and sold" Dunning's testimony and that the prosecutor was "supporting perjury." The prosecutor properly attempted to refute these challenges to Dunning's testimony by arguing that because the plea agreement was contingent on his testifying credibly, it did not logically provide Dunning with a motive to be untruthful in this case. "[T]he state may argue that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie." (Citation omitted.) *State* v. *Warholic*, 278 Conn. 354, 365, 897 A.2d 569 (2006). In addition, it was within the bounds of fair argument for the prosecutor to have attempted to refute defense counsel's arguments by referring in detail to the evi-

dence that, in his view, supported a finding that Dunning had testified credibly. "A prosecutor may urge the jury to find *for stated reasons* that a witness was truthful or untruthful. . . . A prosecutor may also remark on the motives that a witness may have to lie, or not to lie, as the case may be. . . . The distinguishing characteristic of impropriety in this circumstance is whether the prosecutor asks the jury to believe the testimony of the state's witnesses because the state thinks it is true, on the one hand, or whether the prosecutor asks the jury to believe it because logic reasonably thus dictates." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Felix*, 111 Conn. App. 801, 811–12, 961 A.2d 458 (2008). At no point in his argument did the prosecutor either expressly or inferentially invite the jury to simply rely on his assessment of the evidence or to trust a personally held belief on his part that Dunning was credible. It is unreasonable to interpret the challenged arguments to suggest that the prosecutor invited the jury to rely on anything other than its own evaluation of Dunning's testimony based on the evidence and the rational inferences to be drawn therefrom.[13]

Finally, the defendant argues that the prosecutor vouched for Dunning by suggesting that, by testifying, he risked being prosecuted for perjury. The defendant asserts that the argument was improper because the prosecutor suggested "that [he] knows if the witness is telling the truth or implie[d] that he possessed information not presented to the jury that would enable him to know if the witness were lying." This argument is not persuasive. For the reasons set forth previously in our analysis of the present claim, we disagree that the prosecutor's arguments concerning Dunning's testimony reasonably could be construed to suggest that they were based on anything other than the evidence before the jury, including but not limited to, the testimony of the victim that all three perpetrators had entered his residence.

The defendant's claim fails because he has not demonstrated that the prosecutor's redirect examination of Dunning or his rebuttal closing argument constituted impermissible vouching for Dunning. Accordingly, we need not engage in an analysis of the *Williams* factors to determine whether the alleged improprieties deprived him of a fair trial.

## II

Next, the defendant claims that the court improperly denied his motion to suppress evidence that was seized pursuant to a search warrant that was not supported by probable cause. We disagree.

It is not in dispute that, on July 30, 2013, the court, *Ginocchio, J.*, granted an application for a warrant to search the defendant's residence[14] and to seize any of

the items that were described in the warrant application as either having been removed from the victim's residence or used or worn by the defendant during the commission of the home invasion. As a result of the execution of the warrant, the police seized several items, including a box of 20 gauge shotgun shells and a black ski mask. In applying for an arrest warrant, the police relied, in part, on items that were seized from the defendant's residence, and evidence of the fact that the police had seized items from the defendant's residence, including the shotgun shells and the ski mask, was admitted at trial.

The defendant filed several motions before the trial court in which he challenged the validity of the search warrant. We will discuss these motions because the defendant asserts that they adequately preserved the claim at issue because the court, in its resolution of the motions, addressed the issue of whether the search warrant was supported by probable cause.

Prior to trial, the defendant, at that time a self-represented litigant, filed two motions for a *Franks* hearing[15] in which, in relevant part, he asked the court to suppress evidence seized from his residence on the ground that the affidavit submitted to the court in support of the search warrant application contained false or incomplete information.[16] On April 29, 2016, the court, *Danaher*, *J.*, held a hearing on the defendant's motions.

The court stated that, during oral argument in support of his motions, the defendant argued that the affidavit in support of the search warrant contained inaccurate statements. The defendant argued that (1) the allegation concerning the amount of cash taken from the victim was not accurate, (2) the allegation that he cashed stolen coins at the supermarket was false because, according to his review of the store surveillance video, he does not appear therein, (3) the allegation concerning the value of all items taken from the victim was, on the basis of his "findings," not accurate, and (4) the allegation that Le had used the victim's credit card at the store is not accurate because the alleged use of the card did not occur at "the exact time" reflected in the surveillance video.

The court observed: "The defendant further argued that the same misrepresentations appear in the arrest warrant, and in addition, paragraph 71 of that warrant is subject to challenge in that (1) the allegation that two people are friends on Facebook and that they entered and exited a store, does not constitute probable cause, and (2) the affiants were reckless in describing codefendant . . . Le's address as 29 Footpath Lane when, in fact, it was the defendant and not . . . Le who lived at that address."

The court referred to the fact that the defendant had submitted five exhibits, which included three reports

that reflect Le's address; an inventory of items seized from the defendant's residence; a portion of the search warrant application being challenged; "a copy of e-mail traffic reflecting information about a 'denied credit card transaction,' apparently at a Stop [&] Shop store, on April 8, 2013, at approximately 10:46 a.m., for a credit card ending in 2561"; and a Coinstar machine[17] receipt from the Stop & Shop store in East Hartford showing that the coins deposited amounted to $68.75 and that a processing fee of $6.74 was deducted from this total amount, resulting in a cash value of $62.01.

After setting forth relevant legal principles, the court, in its written memorandum of decision, set forth the following analysis with respect to the defendant's *Franks* challenge to the search warrant:[18] "The defendant failed to offer either affidavits or sworn or otherwise reliable statements of witnesses in support of his motion, nor did he explain his failure to produce such evidence. He simply represented that certain allegations in [the] . . . search warrant affidavit were not correct. The defendant's representation that paragraph 36 [of the search warrant affidavit] does not accurately recount the amount of cash taken, and that the value of all items taken [is inaccurate] not only is an unsworn claim, but it is also insufficient to overturn the finding of probable cause, as is the unsworn claim that the 'exact time' that a codefendant 'swiped a stolen credit card' is incorrect. Similarly, the defendant's claim that he was not one of the people depicted in a surveillance video is also an unsworn claim and so cannot serve to support the defendant's motion.

"The court also recognizes that even if the defendant were to make a substantial preliminary showing that the affidavits at issue include false statements, made knowingly and intentionally or with reckless disregard for the truth, the defendant cannot prevail on his motion if the statements at issue are not necessary to the finding of probable cause. . . .

"Even if the defendant had properly supported his motion with sworn affidavits *and* the court were to exclude the allegations challenged by the defendant, the court finds that there was ample alternative probable cause evidence. For example, the affidavit asserts that a vase containing loose change was taken [from the victim]. . . . The approximate amount of loose change taken in the robbery was thereafter allegedly deposited at a Stop [&] Shop store in a Coinstar machine, the amount deposited was consistent with the amount stolen, the Stop [&] Shop activity was recorded [by means of] a surveillance camera, and two educators from the Woodland School, where the defendant attended school, positively identified the defendant in the surveillance camera recording. . . . In addition, the affidavit alleges that the defendant is associated with two other individuals, Le and . . . Dunning, and

that there is independent probable cause that Le and Dunning were involved in the home invasion. The foregoing allegations, alone, establish probable cause sufficient to issue the search warrant that the defendant challenges.

"The defendant also argued that the affiants were reckless in asserting that Le lived at 29 Footpath Lane, East Hartford, the location to be searched. The defendant's representations are unsworn and, even if they were properly authenticated, they do not preclude a finding of probable cause. Even if the affiants had asserted that . . . Le lived elsewhere, the affiants set forth the basis for their assertion that the defendant resided at 29 Footpath Lane . . . and the independent evidence of the defendant's involvement in the robbery supports a finding of probable cause that there was evidence to be found at the location where the defendant resided, regardless of whether Le also lived at that same address." (Citations omitted; emphasis in original; footnote omitted.) Thereafter, the court denied the motion.

Following the court's ruling, the defendant, appearing as a self-represented litigant, filed a motion to suppress any and all evidence seized from his residence. Among the arguments raised therein, the defendant argued that "[t]here was no fair probability that contraband or evidence of a crime [would] be found at [his] residence," the facts stated in the warrant application were made "[falsely] and/or in reckless disregard for the truth knowingly and intentionally, for the purpose of misleading a judge," the property seized was not described in the warrant, and "there was no probable cause for believing the existence of the grounds on which the warrant was issued."

On June 28, 2016, the court, *Danaher*, *J.*, held a hearing on the motion. The court provided an oral ruling on the motion by observing that the substance of most of the arguments presented by the defendant were previously raised in the context of the defendant's motions for a *Franks* hearing, and the court relied on its earlier ruling denying those motions. The court observed, however, that the defendant raised an additional claim in the context of the motion to suppress, which was that the police had acted outside of the authority granted to them by the search warrant by seizing from the residence "his safe." The court referred to various legal authorities for the proposition that, "when conducting a search pursuant to a valid warrant, police are entitled to search containers that could logically hold the item or items sought." The court stated: "In this case, the warrant permitted the officers to search for and seize small items such as $200 in cash, memory disks . . . for a digital camera, and a gold watch. Those items, which were contained in the warrant, could logically be concealed in the container/safe that was located on

the defendant's property. And the police were entitled to search inside that container, particularly since the defendant's brothers identified the safe as belonging to this defendant.

"Once the safe was opened and was found to contain contraband specifically described in the warrant, in this case, stolen shotgun shells, the safe, itself, constituted evidence of consciousness of guilt and so was properly subject to seizure."

The court further explained its ruling, as follows: "Consistently throughout the defendant's argument, there is a disagreement with certain specific facts that are set forth in the [affidavit] at issue. Again, there's no factual basis that would permit me to conclude that the allegations in the affidavit are in error. But, beyond that . . . it's necessary for any judge, in reviewing a warrant and determining whether probable cause is present, to review the totality of the warrant. The warrant is reviewed within . . . the four corners. And, in putting all those facts together, the court makes a determination as to whether probable cause exists.

"One example, the defendant indicated . . . that [the allegation that he entered and left] a Stop [&] Shop is not probable cause of a crime, and that's true. But, those facts are not looked at in isolation; they're looked at in conjunction with the fact that, not very long after the robbery . . . the defendant was [accompanying Le in the supermarket and] . . . there was substantial evidence [that Le] was involved in the robbery. And . . . Le [pleaded guilty] in connection with [the home invasion] . . . [a]nd has been convicted of . . . carrying out this home invasion. . . .

"I've reviewed the affidavit; I've read it in its entirety. And I have concluded, more than once, that there was probable cause to support the search." Relying on the foregoing reasons, the court denied the motion to suppress.[19]

Presently, the defendant claims that the search warrant was not based on probable cause for two broad reasons. First, the defendant argues that, even if there was probable cause to believe that he possessed some of the victim's belongings at the time that the robbery occurred, the facts presented in support of the search warrant were insufficient to demonstrate that he would have retained the victim's stolen property, for four months following the home invasion, in his residence that was searched. Second, the defendant argues that the facts set forth in the search warrant application were insufficient to demonstrate that he was a participant in the home invasion. The defendant argues that the facts presented merely demonstrated that he was a friend of Le on the social media website "Facebook" and that he and Le were at a supermarket together on the morning following the home invasion.

As we have discussed previously, the defendant raised several motions before the trial court in which he argued that the search warrant application contained false or incomplete information and asked the court to suppress evidence obtained as a result of the search of his residence. It appears that, in general terms, the court interpreted these motions as having raised issues concerning false or incomplete information in the warrant application and, in rejecting those claims, stated in general terms that the facts presented were sufficient to demonstrate probable cause to search the residence. It does not appear that the defendant distinctly presented or that the court squarely addressed the arguments presented here, which are unrelated to an allegation of false or incomplete information in the search warrant application. To the extent that the defendant's claim is unpreserved, we may review it pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), as the defendant requests in his appellate brief.[20] The record provides this court with an adequate basis to review the claim because it contains the materials presented to Judge Ginocchio when he granted the search warrant application. The claim is of constitutional magnitude in that it seeks to vindicate the defendant's fourth amendment right to be free from an unreasonable search.

"Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . Accordingly, [o]ur review of the question of whether an affidavit in support of an application for a search [and seizure] warrant provides probable cause for the issuance of the warrant is plenary. . . .

"Both the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution prescribe that a search warrant shall issue only upon a showing of probable cause. Probable cause to search exists if . . . (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Although [p]roof of probable cause requires less than proof by a preponderance of the evidence . . . [f]indings of probable cause do not lend themselves to any uniform formula because probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. . . . Consequently, [i]n determining the existence of probable cause to search, the issuing [judge] assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . .

there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . The determination of probable cause is reached by applying a totality of the circumstances test. . . .

"The role of an appellate court reviewing the validity of a warrant is to determine whether the affidavit at issue presented a substantial factual basis for the [issuing judge's] conclusion that probable cause existed. . . . [Our Supreme Court] has recognized that because of our constitutional preference for a judicial determination of probable cause, and mindful of the fact that [r]easonable minds may disagree as to whether a particular [set of facts] establishes probable cause . . . *we evaluate the information contained in the affidavit in the light most favorable to upholding the issuing judge's probable cause finding. . . .* We therefore review the issuance of a warrant with deference to the reasonable inferences that the issuing judge could have and did draw . . . . In evaluating whether the warrant was predicated on probable cause, a reviewing court may consider only the information set forth in the four corners of the affidavit that was presented to the issuing judge and the reasonable inferences to be drawn therefrom. . . .

"Of course, [t]he determination of probable cause to conduct a search depends in part on the finding of facts so closely related to the time of the issuance of the warrant as to justify a belief in the continued existence of probable cause at that time. . . . Although it is reasonable to infer that probable cause dwindles as time passes, no single rule can be applied to determine when information has become too old to be reliable. . . . Consequently, whether a reasonable likelihood exists that evidence identified in the warrant affidavit will be found on the subject premises is a determination that must be made on a case-by-case basis. Accordingly, we have refused to adopt an arbitrary cutoff date, expressed either in days, weeks or months, beyond which probable cause ceases to exist. . . . The likelihood that the evidence sought is still in place depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched. . . . [W]hen an activity is of a protracted and continuous nature the passage of time becomes less significant." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Hanisko*, 187 Conn. App. 237, 245–48, 202 A.3d 375 (2019).

"[T]he resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants. . . . Furthermore, [a] reviewing court should not invalidate a warrant as long as the inferences drawn by the issuing magistrate are reasonable under all of the circumstances set forth in the affidavit regardless of whether that court would have

drawn the same inferences." (Citation omitted; internal quotation marks omitted.) *State* v. *Martinez*, 51 Conn. App. 59, 66–67, 719 A.2d 1213, cert. denied, 247 Conn. 952, 723 A.2d 324 (1998).

First, we address the argument that the affidavit did not provide probable cause to believe that the items sought to be seized would be found in the defendant's residence four months following the commission of the home invasion. Among the averments in the thirty-seven paragraph affidavit, dated July 30, 2013, and sworn to and submitted by State Police Detectives Laura Kraus and Jeremy Combes,[21] were facts concerning the home invasion, including the fact that the victim described three male perpetrators, all of whom were wearing dark clothing and dark knit caps during the incident. The affidavit detailed the items taken from the victim, including but not limited to his credit and ATM cards, camera equipment, a leather jacket, a large ceramic vase containing coins, firearms, ammunition, and a knife.

The affidavit further provided that the defendant, who had a criminal history involving firearms, was believed to reside at 29 Footpath Lane in East Hartford. He was identified in an East Hartford supermarket surveillance video from the morning of April 8, 2018. The officers averred that the defendant was accompanied by Le in the supermarket. The defendant was seen cashing a receipt for $62.01, which he obtained from a coin exchange machine. The officers averred that this amount and the $6.74 fee that is automatically deducted by the coin exchange machine was close to the estimate of the value of the coins taken during the home invasion. At the same time, Le was seen attempting to use the victim's stolen credit card at a cash register. Thereafter, before the two men left the store together, the video shows that the defendant and Le walked to the customer service desk, and the defendant handed a cashier a lottery ticket and exchanged a twenty dollar bill for smaller denomination currency. The affidavit also reflected that a review of the defendant's Facebook page indicated that he and Le were friends.

There were several averments concerning Le in the affidavit, including the fact that he had a criminal history and that, in June, 2013, an East Hartford police officer stopped Le in the course of investigating a motor vehicle complaint. During a search of the vehicle Le was operating, the police found shotgun rounds and a hunting knife, all of which the victim readily identified as having been taken from him during the home invasion. Le's arrest for crimes related to the home invasion followed.

Additionally, the affidavit provided as follows: "[B]ased upon the affiants' training and experience, the affiants know that it is common for people traveling to other locations, potentially unfamiliar to them, to utilize a GPS device in order to obtain directions to that loca-

tion. Suspects involved in the planning, coordination and execution of a conspiracy utilize cell phones to communicate their plans and activities either through voice contact or SMS (text) messaging. Your [a]ffiants know that many people carry and use cellular phones as a part of daily life while traveling, including victims and suspects. The affiants know that crimes involving multiple suspects would necessitate communication between them, and that it is reasonable to believe that such communication would take place prior to the crime (pre-planning stage), during the crime (execution stage), and after the crime (cover-up/flight stage). It is also reasonable that the suspects may have used cellular devices to contact each other in order the execute the details of the crime."

The affidavit further stated: "[B]ased upon the affiants' training and experience, the affiants know that persons involved in criminal activity will often elicit the aid of an accomplice to facilitate the commission of a crime. That dependent upon the complexity of the criminal endeavor, pre-planning, and after the execution of the crime(s) persons will frequently change their place of residence to inhibit the discovery of their activity or . . . use multiple addresses, particularly of their families, to secret[e] evidence of the crimes they are involved in, including firearms/weapons and burglary tools used in the crime. That persons involved in criminal activity who steal large quantities of items will often hold onto the stolen items for a long period of time. Persons involved in criminal activity are aware that police officers check pawn shops for stolen items frequently and will often sell, pawn, and/or disperse the stolen items in small quantities over a long period of time in an attempt to inhibit the discovery of evidence of their crimes. Persons involved in criminal activity will often keep stolen items as a trophy of their crimes for days, months, and even years. Persons involved in criminal activities also give stolen items to close friends and/or family members as gifts. That based on the patterns of conduct exhibited by . . . Le as it is known to the affiants it is likely . . . Le was engaged in similar actions that are intended to inhibit efforts of law enforcement to discover him or evidence to support his role in criminal activity. . . .

"[B]ased upon the aforementioned facts and circumstances, the affiants have probable cause to believe that . . . Le did participate in a home [invasion at the victim's residence] . . . . That the total estimated value of items taken including cash from the victim's bank accounts, wallet, and loose coin total approximately $29,163.52. That [the defendant] and . . . Le are friends on Facebook. That Stop & Shop surveillance video shows that [the defendant] and . . . Le enter and exit the store together. That . . . Le attempted to use [the victim's] stolen Bank of America card in Stop & Shop in East Hartford on [April 8, 2013], at approxi-

mately 10:46 a.m. That [the defendant] cashed in coins in the Stop & Shop Coinstar machine. That evidence of this will be found at [the defendant's residence], which will establish probable cause for the crimes of home invasion . . . kidnapping in the first degree . . . threatening . . . robbery in the first degree . . . larceny in the first degree . . . [and] burglary in the first degree . . . ." Among the items that were the subject of the search warrant were the victim's belongings that were taken from his residence, articles of clothing that were consistent with those worn by the suspects, and "cell phones and GPS devices."

On the basis of the foregoing facts as set forth in the affidavit, as well as the reasonable inferences to be drawn therefrom, there was probable cause to conclude that items connected with the invasion of the victim's residence would be found in the defendant's residence on July 30, 2013. The defendant argues that the affidavit lacked any averments to support a finding that he had a personal interest in the items taken from the victim's residence or whether or how the suspects divided the items taken during the home invasion. Likewise, he argues that there were no facts alleged to support a finding that he would keep any items related to the home invasion for four months.

Because the affidavit set forth facts that either implicated the defendant as a participant in the commission of the home invasion or as being connected to Le, who was a participant in the home invasion, shortly after the home invasion occurred, it was reasonable to infer that the defendant may have possessed items taken from the victim or that he possessed devices, such as a cell phone, that would have been used in the commission of the crime.

Furthermore, on the basis of the averments set forth in the affidavit, it was reasonable to believe that the defendant would have possessed these items four months following the commission of the crime. In light of the averments concerning the use of cell phones or GPS devices by criminals, as well as the reasonable inference that these types of devices typically are retained and used for months or years, it was not unreasonable to infer that, four months after the home invasion, the defendant probably possessed a cell phone or a GPS device that he had possessed at the time that the crime occurred. It was also reasonable to believe that, at the time that the warrant application was presented to Judge Ginocchio, the defendant still would have possessed the types of items that were removed at gunpoint from the victim's residence. The affiants stated that criminals who steal many items divide them among themselves, may retain them for "days, months, and even years" following the crime, and may transfer possession of items to friends and family members. The issuing judge reasonably could have relied on the

training, experience, and expertise of the affiants in this regard. In light of the variety of items taken, it was reasonable to suspect that one or more of them would be kept by the defendant in his residence. In light of the averments set forth in the warrant application, probable cause was not dependent on a showing that the defendant was engaged in a continuing criminal enterprise. Accordingly, we are not persuaded that probable cause was lacking due to the four months that transpired between the commission of the crime and the issuance of the search warrant.

Finally, we address the defendant's contention that "[t]he affidavit . . . did not show a nexus between Le and [him] to suggest that [he] was a participant in the robbery." The defendant attempts to persuade us that the facts in the affidavit concerning his friendship with Le and his presence with Le at the supermarket on the morning following the home invasion reflected innocent behavior that did not give rise to a suspicion that he was a participant in the home invasion. Moreover, the defendant attempts to downplay the significance of the fact that the surveillance video from the supermarket depicted him cashing in a coin exchange machine receipt. As the defendant argues, "[c]oins are fungible items. Many people collect spare change in containers and cash it in in large quantities . . . . Nor does the affidavit make any representation about whether $68 worth of coins is an unusual sum at a Coinstar machine."

The defendant's arguments are not persuasive. "[I]t is axiomatic that [a] significantly lower quant[um] of proof is required to establish probable cause [rather] than guilt. . . . [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub silentio impose a drastically more rigorous definition of probable cause than the security of our [citizens] . . . demands. . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." (Citation omitted; internal quotation marks omitted.) *State* v. *Batts*, 281 Conn. 682, 701, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007). In light of other facts set forth in the affidavit, it was reasonable to infer that the defendant's act of exchanging coins by means of the Coinstar machine was suspicious and tended to give rise to probable cause that he possessed evidence related to the home invasion. The affidavit reflected that the defendant was accompanied in the supermarket by Le, a person who was identified as a suspect in the home invasion. The video supported a finding that the defendant had cashed approximately $68 in coins. The victim reported that, only hours earlier, between $75 and $100

in coins was taken from his residence by three men, all of whom had concealed their identity from him. While the defendant was cashing in the receipt for the coins, Le was at a cash register attempting to use the victim's stolen credit card.

Additionally, it suffices to observe that the premise of the defendant's argument is unsound. At issue is the validity of a search warrant, not an arrest warrant. A finding of probable cause to search did not depend on facts in the affidavit that tended to demonstrate that the defendant was a perpetrator of the home invasion. The affiants presented facts that gave rise to a probability of his being in possession of items connected with the home invasion due to his participation in the criminal endeavor *or* due to his relationship with and his activities with Le, who was portrayed as a suspect in the crime, within hours of the commission of the crime. On the basis of our review of all of the facts in the affidavit, we disagree that probable cause was lacking. Accordingly, the defendant's claim fails under *Golding*'s third prong because he has failed to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.[22]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] By means of a special interrogatory submitted to the jury, the jury found that the defendant committed the crimes of home invasion and robbery with the use of a firearm in violation of General Statutes § 53-202k. The defendant received a total effective sentence of thirty years of incarceration, execution suspended after twenty years, followed by five years of probation.

[2] In several telephone conversations, the defendant made statements while incarcerated that tended to implicate him in the home invasion. Two months prior to his release, the defendant had a telephone conversation with his mother in which they discussed financial matters. During the conversation, the defendant stated, "I'm coming across a bunch of money when I get out, that's why I gotta get out." In a telephone conversation with Le that took place on March 23, 2013, the defendant referred to his imminent release from prison. He stated that Dunning was going to be "ready" and that he would tell Dunning that Le had "everything set up." In a telephone conversation with his father that occurred on February 7, 2015, while he was incarcerated and awaiting trial, the defendant stated that he had his upcoming case "in the palm of his hand." The defendant, revealing his knowledge of the crime, also stated that Le, who had accepted a guilty plea, had "copped out" and was "the mastermind."

[3] Approximately one hour after the defendant, Le, and Dunning left the crime scene, Dunning used the victim's ATM card at an ATM in Hartford. At 2:20 a.m., on April 8, 2013, one of the perpetrators used the victim's credit card at a gas station in Manchester. Later in the morning of April 8, 2013, Le, who was accompanied by the defendant, attempted to use the victim's credit card at a supermarket in East Hartford.

[4] The shotgun shells, as well as a black ski mask, were discovered in the defendant's bedroom and seized by the police during a subsequent search of his residence in East Hartford.

[5] Surveillance video from a supermarket in East Hartford showed that, during the morning of April 8, 2013, the defendant, who was accompanied by Le, deposited approximately $68 in a coin exchange machine, resulting in a receipt in the amount of $62.01. During the police investigation of this case and police questioning of the defendant, the defendant initially "denied hanging out" with Le and told police investigators that he was not at the supermarket with Le on April 8, 2013. After the police told the defendant that witnesses had identified him as being at the supermarket at that time, the defendant told the police that, at Le's request, he had accompanied Le to the supermarket, Le had exchanged coins at the supermarket, and Le

had given him some money.

[6] The police later found a pair of gloves in the victim's yard. DNA testing of the gloves supported a finding that they had been handled by Dunning and the defendant's brother, with whom the defendant resided at the time of the events underlying this appeal. Prior to the home invasion, the defendant purchased the gloves and provided them to Dunning.

[7] Donald Lavery, a correctional officer, testified that the phrase "putting hands [on]" is synonymous with assault.

[8] Although the defendant did not raise this claim before the trial court, we may review it because, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012).

[9] Initially, Dunning testified that he alone held the victim at gunpoint during the home invasion. Later, he testified, consistent with the victim's testimony, that he had joined Le and the defendant in searching the victim's residence for valuables.

[10] According to Dunning, he was charged initially with "home invasion, burglary one, robbery one, larceny one, threatening one, [and] kidnapping one."

[11] Part of the defendant's claim on appeal is based on the fact that Judge Dooley's name appeared in the plea agreement, thereby reflecting that she would be required to determine whether Dunning had testified credibly. The defendant observes that "[t]he parties should have redacted the name of the sentencing judge from the plea agreement," but, nonetheless, states that he is not raising an independent claim related to their failure to do so. It suffices to observe that the prosecutor did not engage in improper argument by referring accurately to an agreement that was in evidence, nor did he invite the jury to draw an unreasonable inference from the agreement.

To the extent that the defendant urges this court, in the exercise of its supervisory powers over the administration of justice; see, e.g., *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009) (discussing supervisory authority); to require courts "to redact portions of a cooperation agreement to reduce any implicit vouching and provide appropriate guidance to future litigants and judges," we decline to do so. We are not persuaded that traditional protections afforded to defendants, which encompass the right to object to exhibits presented by the state and to request appropriate redactions, do not adequately protect a defendant's rights with respect to the issue raised in the present claim.

[12] We further observe that, in its jury charge, the court instructed the jury in relevant part that the court's role was to state the rules of law, the jurors were "the sole judges of the facts," and the jury must find facts solely on the basis of the evidence. The court also stated: "The actions of the court during the trial and ruling on motions or objections by counsel or in comments to counsel or in setting forth the law in these instructions are not to be taken by you [as] any indication of the court's opinion as to how you should determine the issues of fact. If the court has expressed or intimated any opinion as to the facts, you are not bound by that opinion. What the verdict shall be is your sole and exclusive duty and responsibility." The court also provided the jury with lengthy instructions about assessing credibility. In relevant part, the court stated: "[Y]ou should size up the witnesses and *make your own judgment as to their credibility* and decide what portion . . . of any particular witness' testimony you will believe based on these principles." (Emphasis added.)

[13] The prosecutor expressly stated to the jury that he was not in any way relying on his personal beliefs or anything outside of the evidence presented at trial. He prefaced his rebuttal argument by stating, in relevant part, as follows: "[F]or a prosecutor or a defense attorney to stand up here and say 'in my opinion,' be careful. Because what they're asking you to do, indirectly, is to say, this person knows a lot. They might know some things that I'm not privy to—objections, you know, evidence that wasn't admitted or just the fact that they've been doing this for a long time. . . . And they're asking you to basically say, hey, trust me, in my opinion I know, that's not proper. If I got up here and said that—well, it would be a big problem for the state, big problem. So, if I ever accidentally say anything like that, disregard it. I try very hard not even to use the word 'I.' It's always the state argues, because I don't want your verdict to rest on that kind of thing. I want [it] to rest on the facts and the evidence, not on my opinions or beliefs."

[14] The affidavit that accompanied the warrant application stated that, according to postal service records, the East Hartford residence where the search occurred was registered to Yvette White, who was the defendant's mother. Additionally, the affidavit stated that the defendant's "Connecticut Identification Card" reflected this East Hartford residence as his address.

[15] "In *Franks* v. *Delaware*, [438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)], the United States Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the [f]ourth [a]mendment requires that a hearing be held at the defendant's request. . . . The court in *Franks* mentioned only a false statement . . . included . . . in the warrant affidavit; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit. . . . If the ensuing *Franks* hearing discloses either an intentional or reckless falsehood, the court must excise that material from the affidavit and judge the probable cause of the affidavit shorn of that material." (Citation omitted; internal quotation marks omitted.) *State* v. *Therrien*, 117 Conn. App. 256, 262, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009).

[16] The motions stated in relevant part: "That the affidavit(s) in this case prepared and served by the constable . . . knowingly and intentionally, or with reckless disregard for the truth, made incomplete statements, half-truths, commissions, and dishonest innuendo concerning items necessary for the finding of probable cause for the issuance of the warrant."

[17] The jury heard testimony from a state police detective that a Coinstar machine, which resembles an ATM, is located in some stores and, essentially, for a commission, exchanges coins for a receipt that may be exchanged for cash in other denominations. She testified that "[y]ou pour all your coins into it and [it] tallies up how much the coin is and then it spits out a receipt and then you take [the receipt] to a cashier or [to] customer service and you get reimbursed for the . . . cash value of the receipt."

[18] Because the defendant's appellate claim is limited to the issue of probable cause as it relates to the search warrant, we need not examine the court's analysis with respect to the arrest warrant.

[19] In 2016, the defendant, appearing as a self-represented litigant, filed a motion in which he asked the court to compel the state to provide him with a copy of a search warrant application for his residence that, in his view, had been presented by the police to the judicial authority prior to the search warrant application that was presented to and granted by Judge Ginocchio in July, 2013. The defendant based his motion on a portion of the supporting affidavit that stated that the application "has been presented to the judicial authority previously." Another portion of the application states that the application "has not been presented . . . in any other court to any other judge or judge trial referee." On November 4, 2016, the court, *Schuman, J.*, held a hearing on the motion for disclosure during which it heard testimony from one of the affiants, Laura Kraus, a state police detective. In relevant part, Kraus testified that the reference to a prior application was simply a typographical error.

In denying the motion for disclosure, the court stated that it found Kraus' testimony to be credible and concluded that there was no prior application for the state to disclose. The court further noted that, because, in connection with the motion, the defendant, who was proceeding at that time as a self-represented litigant, believed that the inaccuracy in the application was a basis on which to suppress evidence seized incident to the search, it would also construe the motion as a *Franks* motion. Treating the motion as such, the court concluded that, without the inaccuracy in the application, there was probable cause to search the defendant's residence and that "there was no intentional or reckless disregard of the truth [or] an intentional misstatement . . . ." Accordingly, the court stated that the grounds set forth in the motion were not a sufficient basis on which to suppress evidence seized during the execution of the warrant at the defendant's residence.

[20] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these

conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[21] Kraus and Combes averred that they had been members of the Department of Emergency Services and Public Protection, Division of State Police, since January, 2006.

[22] Alternatively, we also conclude that the defendant's claim fails under *Golding*'s fourth prong. "Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the [evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] . . . and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . The state bears the burden of proving that the error is harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Smith*, 156 Conn. App. 537, 560–62, 113 A.3d 103, cert. denied, 317 Conn. 910, 115 A.3d 1106 (2015).

Although the state introduced evidence seized from the defendant's residence, including shotgun shells and a ski mask, the state has demonstrated that, in light of the strength of its overall case apart from this evidence, it is unlikely that this evidence significantly contributed to the verdict reached by the jury. Relying on our previous discussion of the facts supported by the evidence, we observe that the state presented testimony from one of the three perpetrators of the home invasion, Dunning, that the defendant was one of the perpetrators. The state presented evidence that, prior to his release from prison, the defendant made statements to his mother that he would acquire "a bunch of money" once he was released. These statements strongly corroborated the evidence that the defendant had participated in the planning and the commission of the home invasion. The state presented video surveillance evidence that depicted the defendant's presence with Le, another person identified as a perpetrator, hours following the home invasion. The surveillance video strongly supported a finding that the defendant exchanged coins that were stolen from the victim at the same time that Le was attempting to use the victim's stolen credit card. Finally, the state presented evidence of the defendant's consciousness of guilt by means of his evasiveness concerning his relationship with Le, his misrepresentations with respect to cashing coins at the supermarket, and the content of his telephone conversations with multiple persons during his incarceration while awaiting trial. As we have discussed previously, in these telephone conversations, the defendant attempted to threaten Dunning to dissuade him from testifying against him and made statements concerning Le that suggested he had knowledge of the planned home invasion. In light of this other evidence that was not tainted by any alleged impropriety with respect to the search warrant, we conclude that the admission of the evidence that was the fruit of the search at issue was harmless beyond a reasonable doubt.

———————————————